[No. B175953. Second Dist., Div. Six. Mar. 4, 2008.]

GARRY N. HOLDGRAFER et al., Plaintiffs and Appellants, v.
UNOCAL CORP. et al., Defendants and Appellants.

908

## Counsel

Law Offices of Richard M. Pearl, Richard M. Pearl; Law Offices of Ilan Funke-Bilu and Ilan Funke-Bilu for Plaintiffs and Appellants.

Horvitz & Levy, Ellis J. Horvitz, David M. Axelrad, Jeremy B. Rosen; Andre, Morris & Buttery, James C. Buttery; Keesal, Young & Logan and Scott T. Pratt for Defendants and Appellants.

## Opinion

**PERREN, J.**—In deciding whether a punitive damages award violates the constitutional prohibition of arbitrary or grossly excessive punishment, the

most important factor to be considered is the reprehensibility of the defendant's conduct.[1] The United States Supreme Court has instructed courts undertaking this inquiry that "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages."[2] On de novo review, we conclude that evidence of two massive oil spills is too dissimilar to be considered in assessing defendants' reprehensibility in causing and responding to the underground contamination of plaintiffs' commercial property. We further conclude that in order to comply with due process, the proscription of "dissimilar acts" evidence in punitive damages cases must apply to both the jury's predicate determination whether a defendant is *liable* for punitive damages (Civ. Code, § 3294, subd. (a)), as well as to its subsequent evaluation of a defendant's reprehensibility in assessing the *amount* of punitive damages to be awarded.

Unocal Corporation (Unocal)[3] appeals from the judgment awarding $2,564,348 in compensatory damages and $5 million in punitive damages on trespass, nuisance, and negligence claims arising from subterranean oil contamination that was caused by a leak from one of Unocal's pipelines. Unocal contends (1) that the claims are barred by the statute of limitations; (2) that the punitive damages award must be reversed; and (3) that interest on the judgment was incorrectly calculated. On the second assignment of error, Unocal asserts that its federal due process rights were violated by the admission of evidence of Unocal's dissimilar conduct relating to other spills that occurred on other pipelines at different locations. (*State Farm, supra,* 538 U.S. at p. 419.) Unocal also claims that the error was compounded by the trial court's refusal of Unocal's proposed instruction limiting the jury's consideration of the evidence. (*Philip Morris USA v. Williams* (2007) 549 U.S. 346 [166 L.Ed.2d 940, 127 S.Ct. 1057, 1063–1065] (*Philip Morris*).)

We agree with Unocal that the punitive damages award does not comport with due process because the jury was effectively invited to punish Unocal for injuring persons or entities that are not parties to this litigation and for conduct that had nothing to do with that which harmed plaintiffs in this case. Because Unocal's dissimilar conduct was admitted not only for the purpose of evaluating the degree of Unocal's reprehensibility in setting the amount of punitive damages, but also to prove that Unocal was guilty of malice, fraud

---

[1] (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 419 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*), citing *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 575 [134 L.Ed.2d 809, 116 S.Ct. 1589].)

[2] (*State Farm, supra,* at pp. 422–423.)

[3] Unocal subsidiaries Union Oil Company of California, Unocal California Pipeline Company, Unocal Pipeline Company, and 76 Products Company, are also named as defendants in the complaint and judgment. All of the defendants are collectively referred to as Unocal.

or oppression, the jury's findings of liability for punitive damages and the amount of the award are both fatally undermined. Accordingly, although we affirm the award of compensatory damages, we reverse and remand for a new trial on punitive damages liability and the amount of such damages to be awarded, if any.

FACTS AND PROCEDURAL HISTORY

I.

*Statute of Limitations and Compensatory Damages*

A.

*Unocal's Operations in San Luis Obispo County*

From the early 1900's until 1997,[4] Unocal owned, operated and maintained 850 miles of subterranean oil pipelines in Central California, approximately 175 miles of which were located in San Luis Obispo County. Several "pump stations" throughout the county that heated and transported the oil were also owned and operated by Unocal. In addition to these pipelines and facilities, Unocal operated 100 wells and a refinery at the oilfields in Guadalupe (the Guadalupe facility), as well as pipelines that carried a petroleum diluting agent, or diluent, to the wells in order to facilitate the pumping of crude oil (the diluent pipelines). The transportation pipelines and pump stations were operated and maintained through Unocal's Northern Pipeline Division. The Guadalupe oil wells were operated by Unocal's oil and gas division, while the facilities that refined the crude oil were operated by the Refinery Division.

One of Unocal's pump stations was located on Tank Farm Road in San Luis Obispo (the Tank Farm facility). Two pipelines (the A and B lines) ran under Tank Farm Road to and from the pump station. The A line ran south approximately nine miles to a pump station at Avila Beach (the Avila Beach facility), while the B line ran north to another station. In 1926, lightning ignited two of the large oil reservoirs at the Tank Farm facility and several smaller storage tanks, resulting in oil spills. There was also some evidence that one of the pipelines had ruptured in 1936, although Unocal had no record of the incident.

---

[4] At that time, Unocal sold its western United States refining and marketing operations.

Unocal replaced the A and B pipelines in 1952, and cathodic protection systems[5] were installed on both lines in 1957. In 1984, Unocal hired a full-time manager to monitor the cathodic protection system. The pipelines were also monitored by a computerized system that continuously gathered information about each pipeline's pressure, temperature and flow rates. Hydrostatic testing of the lines every five years from 1972 to 1988 did not identify any leaks, although the September 1988 monthly activity report referred to prior valve leaks on the A and B lines.[6]

From 1972 to 1992, there were a total of 463 leaks in the Northern Pipeline Division's pipelines, including 324 that were related to corrosion. Forty-one of the leaks were in the San Luis Obispo District, which encompassed all of Unocal's facilities in San Luis Obispo County. Nine of those leaks, most of which occurred at the Avila Beach facility where cathodic protection was at its lowest, were the result of external corrosion. Unocal had no reports of any corrosion leaks from the A and B lines during that period.

James Bushman, the Holdgrafers' pipeline corrosion expert, opined that Unocal's corrosion leaks were excessive. He also concluded that the A and B lines would not have been replaced in 1952 had they not been leaking due to corrosion, and he inferred that there would have been multiple corrosion leaks on those lines from the 1950's to the 1980's because they were placed in corrosive soil and operated at a higher temperature than other pipelines for which there were reports of corrosion. Bushman also inferred from the high number of leaks that Unocal did not take appropriate monthly readings or budget enough money for its cathodic system.

John Scoggins, a former Unocal employee who worked at the Tank Farm and Avila Beach facilities from approximately 1966 to 1986, testified that an average of three leaks occurred each month, usually as the result of corrosion. He was only able to specifically recall leaks at the Avila Beach facility, however, as well as a leak into the San Luis Creek in the 1980's from a pipeline that runs west from the A and B lines. Scoggins also testified that he participated in the monthly monitoring of the cathodic protection system during the entire course of his employment, and that he visited each test station in the district for that purpose at least once a month. He also testified

---

[5] Cathodic protection was defined at trial as a method for controlling corrosion of buried or submerged metal pipes.

[6] In 1982, approximately 30 feet of pipeline was repaired at the source of the B line after it ruptured due to an employee error that created too much pressure. The resulting spill of approximately 1,000 barrels of crude oil was contained within the Tank Farm facility.

that whenever a problem was discovered, he reported it to his supervisors and assisted in the repair.

## B.

### *Discovery of the Contamination on Plaintiffs' Property*

Plaintiffs[7] are the owners of a 7.2-acre, four-parcel property on Tank Farm Road. Plaintiffs Garry N. Holdgrafer (Holdgrafer) and Evelyn Holdgrafer purchased the property with Harold and Audrey York in 1973 for $50,000. The Yorks sold their interest in the property to Robert Miller and Neil Maloney in the mid-1970's. Plaintiff Holdgrafer & Associates was subsequently formed to own and develop the property. In 1995, Unocal guaranteed a $600,000 loan on the property, the proceeds of which were used by plaintiffs Garry N. Holdgrafer II, Cindy Okerson, and Holdgrafer & Okerson to buy out Miller and Maloney's interest in the property.

By 1982, three industrial buildings had been built on the two front parcels of the property and were fully rented to various tenants. In 1988, a prospective buyer of land on Tank Farm Road conducted preliminary soil tests that revealed oil contamination. The property was near Plaintiffs' property. Unocal acknowledged that it owned and operated two underground pipelines along Tank Farm Road, asked to see the final soil report when it was available, and represented that "[i]f the contamination is a result of our operations, we will work with [the present owner of the property], the county, and Regional Water Quality Board to resolve the problem."

In an October 1988 internal memorandum, Unocal noted that "[w]e have both soil and groundwater contamination at our San Luis Obispo Tank Farm and adjacent properties. Two pending property sales . . . fell out of escrow because of the discovery of oil contamination. Subsequent site investigations have confirmed extensive contamination. There is no question that this was caused by either past pipeline leaks (although we have no record of any) or migration from the tank farm area." Unocal paid $210,000 to the landowners who lost interest on the land sales, and stated its intent "to provide the property owners with a cleanup guarantee to the effect that Unocal will remediate the properties to the satisfaction of the lead agency (California Regional Water Quality Control Board)."

---

[7] Garry N. Holdgrafer, Evelyn Holdgrafer, Garry N. Holdgrafer II, Cindy Okerson, Holdgrafer & Associates, and Holdgrafer & Okerson, are collectively referred to as Plaintiffs.

Holdgrafer saw the tests being conducted on the neighboring property and heard a "rumor" there was contamination. Holdgrafer contacted Ron James, the supervisor of Unocal's Tank Farm facility, who told him, "[w]e are investigating it and we have a report and it shows that there is contamination along Tank Farm Road." On January 23, 1989, Unocal wrote to Holdgrafer stating it was "in the process of investigating hydrocarbon contamination in the San Luis Obispo area around Tank Farm Road" and seeking permission to conduct soil tests on Plaintiffs' property in furtherance of its investigation. The tests were conducted, and contamination was discovered on the two parcels of Plaintiffs' property that abut Tank Farm Road. Unocal informed Holdgrafer of the test results, and provided him a copy of its experts' investigation report on the matter.

Unocal searched its internal leak records and retained environmental experts to investigate the contamination. James testified that no reports or evidence of a specific leak was found. With approval from the Regional Water Quality Control Board (RWQCB), Unocal drilled soil borings and monitoring wells along Tank Farm Road. The environmental experts' reports identified a plume of contamination under a portion of Plaintiffs' property. Holdgrafer was promptly provided those reports. Unocal has continuously monitored the contamination to ensure that it is not migrating.

Although the RWQCB initially concluded that the contamination would have to be removed, it did not demand excavation. In early 1991, Unocal submitted a risk assessment to the RWQCB indicating that the contamination does not pose a risk of harm to human health.[8] In 2002, Unocal submitted its corrective action plan to the RWQCB, in which Unocal proposed that it continue to monitor the contamination and allow natural attenuation to biodegrade it over time as an alternative to excavation. In the meantime, Unocal has continued to monitor the contamination and report the results to the agency.

C.

*The Negotiations*

In November of 1989, Holdgrafer retained Attorney Hank Mott to advise him regarding the contamination. On December 5, 1989, Mott sent a letter to Unocal stating that "[t]he evidence is very conclusive that my client's real

---

[8] Unocal estimated that total excavation would cost in excess of $28 million.

property has been damaged by crude oil from your company's operations. The impact on my client's use of the property is extremely serious. A prospective lender or purchaser of the property will not be interested in the property due to this condition. We will be required to disclose this situation and this will make it virtually impossible to get a loan or to sell the property at its fair market value. [¶] We are prepared to file suit for the damages we have sustained. We are also prepared to enter into a sale of [the two parcels] to your company which are affected by the crude oil for the sum of 3.76 million dollars."

On February 21, 1990, Unocal, through its assistant counsel, Walter W. Crim, responded: "We agree that the Site Investigation Report shows that crude oil is present under your client's property. However, we disagree that your client has suffered damages as a result of the crude oil being present. Your letter indicates that 'a prospective lender or purchaser of the property will not be interested in the property due to this condition.' This may or may not be true. As you are probably aware, the . . . property which is west of your client's property was sold even with the noted contamination. Thus, the fact that the property is contaminated does not mean that the property cannot be sold for its fair market value. [¶] If your client is desirous of selling the property to a bona fide purchaser, we will cooperate with the prospective purchaser and lender to allow the transfer to go through. [¶] As you are probably aware, Unocal is in the process of completing its investigation and will begin remediation in the area as required by the Regional Water Quality Control Board. Unocal is committed to this. Unocal is also committed to work with its neighbors along Tank Farm Road to ensure that they do not suffer damages as a result of the contamination. However, this commitment is only for actual damages not prospective damages which would be considered speculative at this time."

At trial, Holdgrafer testified that Crim's letter persuaded him that Unocal would "take care of the problem" without the need for a lawsuit, and that he told his attorney that "if they were going to clean it up, in his opinion, that would be the most cost-effective method of trying to address this problem." Holdgrafer thereafter met with James at least once a month until James left San Luis Obispo in 1994, and was repeatedly assured "that it was Unocal's responsibility and they would take care of the problem . . . ." James's successor, Bob Hill, also repeatedly assured Holdgrafer "that it was Unocal's fault, they would take the blame for it, and they were working on some way to solve the problem."

Settlement negotiations continued from 1995 until early 2001. After Hill left in 1996, Mike Biggi, Unocal's Vice-President of Environmental Affairs, was brought in to negotiate a settlement of Plaintiffs' claims. During that time, in accordance with Holdgrafer's demands, Unocal assisted in refinancing when the noteholders refused to provide long-term financing as a result of the contamination. In October 1996, Unocal purchased the $1.5 million first trust deed note on the property. Unocal reimbursed Plaintiffs for fees incurred in seeking long-term financing, including the increase in interest payments that Plaintiffs incurred in obtaining a short-term extension of the loan. Plaintiffs have continued to make monthly payments to Unocal at the lesser interest rate.

In 1994, Holdgrafer was unable to obtain a $600,000 loan to buy out Miller and Maloney's interest in the property on behalf of his son and daughter-in-law (plaintiffs Garry N. Holdgrafer II and Cindy Okerson). Holdgrafer notified Unocal that he and his partners would file suit unless Unocal would assist them in obtaining financing. Holdgrafer & Associates thereafter obtained a $600,000 loan with a five-year term for which Unocal provided a guaranty. The loan was subsequently extended for several months after Unocal provided additional guarantees and paid the associated fees. At Holdgrafer's request, Unocal assumed the loan in the same manner it had assumed the first trust deed by purchasing the second trust deed. Both notes are now beyond their original terms and are subject to being called on 30 days' notice.

In October of 1996, Biggi sent Holdgrafer a letter asking him "[i]f Unocal were to acquire the subject loan or replace with a similar loan, would this resolve outstanding issues with Unocal?" At trial, Biggi testified that Unocal's "goal was to settle [Plaintiffs'] claims for contamination of the property, and the intent was to try to settle that claim through helping to finance, in addition to giving him some compensation . . . because it had gone on for so long." Unocal also explored with Holdgrafer the possibility of "breaking the contaminated property off from the uncontaminated property and attempting to agree to pay him damages for the property." The parties came close to settling the matter in 1996. In 1998, Unocal proposed to settle by, among other things, paying off the outstanding balance on the $600,000 loan and waiving any interest charges on the $1.5 million loan through 2013. No settlement was reached, however, because Holdgrafer would not agree to Unocal's release and indemnification terms.

Settlement discussions ultimately broke down. In 2000, Holdgrafer hired an attorney to pursue litigation against Unocal. Plaintiffs filed their complaint

against Unocal on April 2, 2001, alleging multiple causes of action, including claims for private nuisance, trespass, negligence, and unfair business practices.

## D.

### The Compensatory Damages Award

In the first phase of trial, the jury found that Unocal was equitably estopped from asserting the statute of limitations as a defense to the lawsuit. The jury specifically found that the estoppel period began on February 21, 1990—the date of Unocal's response to Holdgrafer's demand letter—and ended in February of 2001.

In the second phase, the jury found that Unocal's contamination of Plaintiffs' property constituted a permanent nuisance and trespass, and that Unocal was negligent. Plaintiffs were awarded $564,348 in damages for past economic loss, and $2 million for the diminished value of their property. Plaintiffs' unfair business practices claim (Bus. & Prof. Code, § 17200), which was to be tried by the court, was settled for an undisclosed amount.

## II.

### Punitive Damages

Civil Code section 3295, subdivision (d), provides that "[t]he court shall, on application of any defendant, preclude the admission of evidence of that defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294." While the statute refers only to evidence of the defendant's financial condition, in practice bifurcation under this section means that all evidence relating to the *amount* of punitive damages is to be offered in the second phase, while the determination whether the plaintiff is *entitled* to punitive damages (i.e., whether the defendant is guilty of malice, fraud or oppression) is decided in the first phase along with compensatory damages. (See, e.g., *Barmas, Inc. v. Superior Court* (2001) 92 Cal.App.4th 372, 374 [112 Cal.Rptr.2d 71]; *City of El Monte v. Superior Court* (1994) 29 Cal.App.4th 272, 274–277 [34 Cal.Rptr.2d 490]; BAJI Nos. 14.72.1, 14.72.2.) Here, however, both entitlement to punitive damages and the amount to be awarded were bifurcated from the issue of liability for compensatory damages. The court granted Unocal's request to bifurcate in this manner after ruling that the evidence regarding other spills at the Guadalupe and Avila Beach facilities was

admissible to prove that Unocal was guilty of malice, fraud or oppression in its dealing with Plaintiffs. In exchange, Unocal waived its right to bifurcation under subdivision (b) of Civil Code section 3294.

### A.

### Unocal's Pretrial Challenges of the Guadalupe and Avila Beach Evidence

Prior to trial, Unocal moved for summary adjudication of Plaintiffs' punitive damages claims on the ground that Plaintiffs could not produce clear and convincing evidence that Unocal acted with malice, fraud or oppression in causing or responding to the contamination of Plaintiffs' property. In opposing the motion, Plaintiffs offered, among other things, declarations and testimony from other lawsuits related to three spills that occurred on other Unocal pipelines at the Guadalupe and Avila Beach facilities in 1990 and 1992 (the Guadalupe and Avila Beach evidence). Plaintiffs asserted the evidence was admissible under *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191 [29 Cal.Rptr.3d 401, 113 P.3d 82], to prove "Unocal's corporate pattern and practice of leaving contamination in place, concealing known contamination, suppressing its public discovery, and intentionally delaying any meaningful investigation or remediation for as long as possible." Citing Evidence Code[9] section 1105, Unocal argued that the proffered evidence was inadmissible and insufficient to establish that Unocal had a habit or custom of avoiding responsibility for its spills, or that Unocal acted pursuant to such a habit or custom in its dealings with Plaintiffs. The court denied Unocal's motion, based in part on the Guadalupe and Avila Beach evidence.

Subsequently, on April 7, 2003, the United States Supreme Court issued its decision in *State Farm*, holding that a defendant's dissimilar conduct cannot provide the basis for an award of punitive damages. (*State Farm, supra*, 538 U.S. at pp. 422–423.) Unocal thereafter renewed its motion for summary adjudication, contending that the *State Farm* decision precluded the court's consideration of the Guadalupe and Avila Beach evidence. The trial court denied the motion.

Unocal subsequently filed motions in limine to exclude the Guadalupe and Avila Beach evidence pursuant to *State Farm* and section 352. The court tentatively ruled it would "allow evidence regarding the actions by Unocal with respect to reporting, maintaining, installation [*sic*], leakage and concealment of leakage from pipelines in the Central Coast Region, to the exclusion of Guadalupe evidence and ocean dumping." The court also ruled, how-

---

[9] All further undesignated statutory references are to the Evidence Code.

ever, that "Plaintiffs shall make an offer of proof outside the presence of the jury if they intend to present any such evidence" and stated that its ruling to allow the evidence "shall be a tentative ruling with respect to the hearing on punitive damages parameters and any Evidence Code Section 405 hearings. Plaintiff is directed to notify the Court when they are ready to have the issue addressed based on the conclusion of all evidence on the issue of punitive damages. The Court will then determine if the tentative ruling shall stand." The court's order also reflected the parties' stipulation "that they will not address either Guadalupe o[r] ocean dumping during their opening statements."

After section 402 hearings held during and at the conclusion of the second phase of the trial, the court rendered its tentative ruling final, concluding that Plaintiffs could present evidence regarding corrosion damage and leaks on Unocal's Guadalupe and Avila Beach pipelines, Unocal's knowledge of those leaks and its failure to make adequate and timely repairs, and evidence that Unocal concealed leaks or contamination to avoid responsibility for cleaning them up. We summarily denied Unocal's writ petition seeking to compel the court to exclude the evidence.

### B.

#### *The Guadalupe Evidence*

Around 1990, Drew Bandy, a fish and game patrol warden for the San Luis Obispo County Marine Patrol, responded to a report that something resembling oil was "seeping through the sand at Guadalupe Beach into the surf zone." When Bandy spoke to Bob Hugenard, a supervisor at the Guadalupe facility, he was told "they had fingerprinted that particular product that had emitted from the beach and it did not match any of the product that they were using in the fields and, therefore, it wasn't theirs." When Bandy asked Hugenard to provide data regarding the amount of seepage that had been emitted, Hugenard responded that "they didn't keep track of how much diluent they used to interject into the wells" and that he believed "it was of no concern as to how much diluent that they used." Hugenard also told Bandy there were gauges for monitoring the output, but they did not work.

John Smith, a former Unocal employee who worked as a field operator at the Guadalupe facility, testified that around 1990 he discovered that the diluent used to facilitate the pumping of oil from the wells had increased by approximately 30 barrels a day. Smith reported this to his supervisor, Bob Ryan, but "nothing was done to cure the situation." Smith also testified that he had seen diluent surfacing on the ground at least 50 different times. Sometime around 1986, Smith was sent to the beach to clean up diluent that

had surfaced on the beach near one of the wells. When Smith reported to his foreman, Dale Hicks, that it could not be cleaned up, Hicks told him, "we don't want anybody to know that we know that this is here." Unocal employee Jim Shoe, the area supervisor who worked out of the Orcutt office, also told Smith and the other employees at the Guadalupe facility "that we weren't to be talking to anybody about the situation." Smith also recounted an incident when "they brought a bunch of tractors in and loaded this stuff up and took it down to a place where they turned it into road mix." Smith also testified that the diluent pipelines "were in a bad state of repair" and that "[t]here were some lines that had 15 or 20 clamps on them in a stretch of 30 or 40 feet." In 1992, Smith contacted state authorities about the contamination at the Guadalupe facility because he "had heard that Unocal was going to sell their lease at Guadalupe" and he feared "that the mess was not going to get cleaned up."

Dan Tucker, a former Unocal employee who worked as a field operator at the Guadalupe facility from approximately 1986 to 1996, testified that he and his supervisor, Mario Rubio, observed diluent on the beach near one of the wells sometime in the late 1980's or early 1990's. Tucker also recounted a meeting at which Hugenard assured the employees that the substance had been tested and "that it isn't anything to do with Unocal; that, you know, it could have been ships that have gone by that have dumped their bilges . . . ." Tucker also eventually reported his concerns about the incident to state authorities.

Allen Huckaby, a lieutenant with California's Department of Fish and Game who has worked with the department's Office of Spill Prevention and Response since 1991, went to the Guadalupe facility in 1992 to investigate reports of oil surfacing on the beach. Hugenard told Huckaby "that the original Water Quality Control Board was on top of the situation at Guadalupe and that what I was seeing was residual sand . . . and the problem wasn't serious." After speaking to Smith, Huckaby directed Unocal to produce its records from the Guadalupe facility. Based on his review of those records, Huckaby concluded "that Unocal had withheld information that should have been reported to authorities regarding spills, numerous spills." He further concluded "that Unocal had indicated they didn't have spills, when in fact they had, to both the California and the Regional Water Control Board." Specifically, records for the period between July of 1984 and July of 1990 reflected a total of 190 leaks during that time, although only 16 were actually reported to the state. Huckaby also calculated from the records that in 1985 alone, approximately 3.5 million gallons of diluent had been lost due to leaks. Unocal also produced a map of the oilfield identifying numerous spills that were never reported. Huckaby testified that "as early as 1978, there was a significant spill adjacent to the ocean and at that same site where we were currently having the problem with oil surfacing." According to Huckaby, that

spill was only discovered by the state because "[t]here was a report of oil off of Pismo on the very same day that coordinated with that particular spill." Huckaby also received Unocal documents disapproving appropriations for the replacement of the diluent pipes, even though one of those documents "painted a picture of the dire need to replace diluent lines because of their leakage."

Gonzalo Garcia, the Unocal employee responsible for overseeing the cleanup at the Guadalupe facility, testified that Unocal discontinued using diluent at the facility in February of 1990. Garcia also provided extensive testimony regarding the decade-long, ongoing project to remove all of the contamination and restore the beach and affected wetlands, at an annual cost of approximately $10 million. In the course of that project, it has been determined that a total of approximately 8.5 million gallons contaminated more than 118 acres at the site. As of the trial, only 2 million gallons had been recovered. In some places, the contamination is 126 feet deep. Garcia acknowledged that "[t]here's no question it's a major contamination site. It's also one of the most incredible ecological resources in the state of California."

## C.

### The Avila Beach Evidence

On the night of August 3, 1992, Huckaby responded to a reported leak at the Avila Beach facility and was informed by Unocal employee William Sharrer that oil had spilled into the ocean. The next day, Huckaby returned to the facility and spoke to James, who was working at that time as the facility's second-level supervisor. Huckaby testified that James told him "it would be impossible to accurately determine the spill volume; that the meters had been bypassed [subsequent to repairing the pipeline] and that the best that they could do was what they estimated just to be on the surface of the water." In further investigating the incident, Huckaby went to Unocal's Santa Maria refinery (from which oil is sent north to the Avila Beach facility). Huckaby testified that he interviewed an individual he believed to be the superintendent of the refinery, who told him "[t]he oil that was transported through the pipeline was metered at the refinery and with the redundant system, it would be pumped into tanks, and the strappings on the tank would also record the amount of oil." The superintendent also told Huckaby "that was their normal protocol. That's how they determined the volume that they received to document." Huckaby also determined that the leaking pipeline "remained activated under pressure for a period of time after they shut off the pump station in Avila." He opined that "corrosion was the single most significant factor" causing the leak.

James initially told Huckaby that 150 barrels of oil had spilled, 100 of which had reached the ocean, and that approximately 70 of those barrels had been recovered. After conducting meter readings at the Santa Maria refinery, Huckaby determined "there was a 660-barrel discrepancy." Based on his experience, Huckaby also believed that the recovery rate James had reported was "extremely high," and that "[r]ecovery rates are closer to 15, 20 percent."

William Sharrer, the environmental affairs supervisor of Unocal's Northern Pipeline Division from 1991 through 1995, responded to the Avila Beach facility after James called him and remained there for approximately 72 hours to oversee the cleanup operation. Plaintiffs' attorney asked Sharrer, "[h]ow many animals were killed as a result of Unocal's contamination?" and "Were there any bathers at the time of the leak that got sick?" Sharrer responded that "[t]here were a number of birds and some mammals that were lost," and that he was unaware of any sunbathers who were claiming illness as a result of the spill.

## D.

### *The Punitive Damages Award*

At the conclusion of the third phase of trial, the jury found by clear and convincing evidence that Unocal was guilty of malice, fraud or oppression on the nuisance and negligence claims, and awarded Plaintiffs $10,000,000.76 in punitive damages. The trial court subsequently remitted the award to $5 million.

## III.

### *Posttrial Proceedings and Judgment*

Unocal moved for a new trial and for judgment notwithstanding the verdict (JNOV) contending, among other things, that Plaintiffs' claims were barred by the statute of limitations and that the Guadalupe and Avila Beach evidence had been admitted in violation of *State Farm*. The court rejected both of these claims. The court's ruling began by stating that "[t]his case is about greed. It is about placing financial self-interest ahead of the interest of others." The court went on to offer "at least two reasons" why the Guadalupe and Avila Beach evidence was admissible: "First, the evidence was relevant circumstantial evidence of Defendants' conduct (i.e., its actions and omissions) on Tank Farm Road as applied to the Plaintiffs' property. In particular, that evidence established practices and policies of Defendants as regards their operations on similar pipelines used for similar purposes under similar circumstances for

many years, and was therefore relevant circumstantial evidence of Defendants' actions and omissions for the pipeline in question (especially in view of the fact that the pertinent records were largely missing). [¶] Second, the evidence in Phase Three was relevant for purposes of determining the appropriate amount of punitive damages under the reprehensibility analysis set forth in *State Farm* . . . ." The court also rejected Unocal's claim "that the evidence of misrepresentations, lies, and concealment involved in Avila Beach and Guadalupe are irrelevant here. The relevancy of those acts or omissions lies in the implication that Defendants acted with the same reckless indifference to the rights of property owners on Tank Farm Road, including Plaintiffs, because they thought that they could, or would, get away with it by under-reporting, concealing, or lying about the contamination until the evidence was just too overwhelming."

The court did, however, conclude that the punitive damages award was excessive. The court accordingly granted a new trial on the issue of punitive damages unless Plaintiffs accepted a reduction of the punitive damages to $5 million. Plaintiffs accepted the remittitur. The court also ordered interest to run on the judgment from the date of the verdict, pursuant to former rule 875 of the California Rules of Court (now rule 3.1802).

## DISCUSSION

### I.

#### *Equitable Estoppel—Statute of Limitations*

It is undisputed that the statute of limitations on Plaintiffs' claims for permanent trespass, permanent nuisance, and negligence was three years (Code Civ. Proc., § 338, subd. (b)), that Plaintiffs became aware of the contamination on their property no later than 1989, and that they did not file their lawsuit until 2001. The jury found, however, that Unocal was equitably estopped from asserting the statute of limitations as a defense to all of the claims. Unocal contends that the evidence is insufficient as a matter of law to support that finding.

"A defendant will be estopped to invoke the statute of limitations where there has been 'some conduct by the defendant, relied on by the plaintiff, which induces the belated filing of the action.' (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 523, p. 550.) It is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff. [Citations.] It is sufficient that the defendant's conduct in fact induced the plaintiff to refrain from instituting legal proceedings. [Citation.] '[W]hether an estoppel exists— whether the acts, representations or conduct lulled a party into a sense of

security preventing him from instituting proceedings before the running of the statute, and whether the party relied thereon to his prejudice—is a question of fact and not of law.' [Citations.]" (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43 [21 Cal.Rptr.2d 110].)

In its special verdict, the jury found that (1) Unocal, through its statements or conduct, had induced Plaintiffs to believe that they need not file a lawsuit in order to receive an amicable settlement of their claims against Unocal; (2) Unocal intended for Plaintiffs to so rely on those statements or conduct; (3) Plaintiffs were "ignorant of the true state of the facts"; and (4) Plaintiffs reasonably relied on Unocal's statements or conduct in postponing their lawsuit. These findings address the essential elements of the equitable estoppel doctrine. (*Skulnick v. Roberts Express, Inc.* (1992) 2 Cal.App.4th 884, 890 [3 Cal.Rptr.2d 597].) The jury also found that Plaintiffs' reasonable reliance on Unocal's representations began on February 21, 1990—the date of Unocal's response to Holdgrafer's demand letter—and ended in February 2001. These findings of fact are binding if supported by substantial evidence. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319 [24 Cal.Rptr.2d 597, 862 P.2d 158].)

Although Unocal correctly notes that the issue is one of law subject to de novo review where only one inference may reasonably be drawn from undisputed facts (*Platt Pacific, Inc. v. Andelson, supra*, 6 Cal.4th at p. 319), we reject its assertion that only one reasonable inference can be drawn from the evidence offered on the issue. Unocal's argument to the contrary is premised on one selective portion of its response to Holdgrafer's demand letter, in which Unocal disagreed with Holdgrafer's claim that the value of his property had been diminished by the contamination. In the same letter, Unocal also represented that its investigation of the matter was ongoing, that it would begin remediation of the contamination as required by the state, and that it would do whatever was necessary to ensure that the affected property owners did not suffer any damages as a result of the contamination. The jury could have inferred from these representations that Unocal was rejecting the claim for damages because it was prepared to remediate the contamination. If Unocal could abate the contamination, then the injury was continuing as opposed to permanent. As a result, Plaintiffs would not be entitled to recover damages for the diminished value of their property. (*Santa Fe Partnership v. ARCO Products Co.* (1996) 46 Cal.App.4th 967, 968–969 [54 Cal.Rptr.2d 214].)

■ Contrary to Unocal's contention, the reasonableness of Holdgrafer's reliance on Unocal's stated commitment to remediate to the satisfaction of the state was not contingent on a belief that Unocal had promised to completely eliminate the contamination. Cleaning up contamination to a level

acceptable to or ordered by a governmental agency may suffice to establish that a trespass or nuisance is abatable and therefore continuing. (*Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087, 1102 [51 Cal.Rptr.2d 272, 912 P.2d 1220], quoting *Capogeannis v. Superior Court* (1993) 12 Cal.App.4th 668, 683 [15 Cal.Rptr.2d 796] [" 'We are satisfied to presume that cleanup standards set by responsible public agencies sufficiently reflect expert appraisal of the best that can be done to abate contamination in particular cases.' "].) In addition, "[w]here a potential defendant has promised to remedy a portion of the damages suffered by the plaintiff, it would be unreasonable to expect the plaintiff to jeopardize the possibility of repair by filing a lawsuit as to items of damage not covered by the defendant's promise. This is particularly true where, as here, the defendant's promise relates to a substantial aspect of the dispute. Certainly the effect of a contrary rule would be to foster the precipitous filing of actions and reduce the possibility of settlement without litigation, outcomes hardly in the best interests of the judicial system or the public at large." (*Shaffer v. Debbas, supra,* 17 Cal.App.4th at p. 43.) A plaintiff claiming a permanent nuisance or trespass must bring one action for past, present and future damages. (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 979 [132 Cal.Rptr.2d 635].) Because Unocal promised to pay any actual future damages, and Plaintiffs could bring only one lawsuit for all of their damages, they acted reasonably in refraining from filing suit so long as Unocal was complying with its promise.

We also reject Unocal's contention that the court erred in admitting evidence of communications between Unocal and Holdgrafer after the statute of limitations had expired. Such evidence was plainly relevant to the jury's determination of the duration of the estoppel. We also find no merit in the claim that evidence regarding the parties' settlement negotiations was improperly admitted. Settlement negotiations are relevant and admissible to prove an estoppel to assert the statute of limitations. (*Flintkote Co. v. Presley of Northern California* (1984) 154 Cal.App.3d 458, 465 [201 Cal.Rptr. 262].) While Unocal correctly notes that these negotiations took place long after the statute of limitations had expired, they were relevant to prove that Plaintiffs were justified in delaying suit as long as they did.

## II.

### *Punitive Damages*

Unocal contends that the punitive damages award violates due process because it is based on dissimilar conduct regarding the spills at the Guadalupe and Avila Beach facilities. We review this claim de novo. (See *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424,

436 [149 L.Ed.2d 674, 121 S.Ct. 1678].) As we shall explain, we agree with Unocal that the Guadalupe and Avila Beach evidence should have been excluded from trial because it involves deplorable conduct that had nothing to do with the conduct that harmed Plaintiffs. Through that evidence, the jury heard that Unocal had concealed other spills and leaks from the public and government, and had also denied responsibility for contamination and misrepresented the magnitude of damage to the environment. This conduct is radically different from the conduct at issue in this case. Unocal reported the Tank Farm Road spill to the state and all of the affected property owners. The contamination was contained and was thereafter continuously monitored by public and private entities, including Plaintiffs, to whom Unocal made full and continuing disclosure. The harm involved the subterranean infiltration of oil onto Plaintiffs' property, for which they rightfully sought compensation to protect their investment. Settlement negotiations continued for over a decade. During this period Unocal not only sought to prevent a recurrence, but guaranteed loans, and otherwise assisted in protecting Plaintiffs from a negative financial impact on their investment. When Plaintiffs determined they were not receiving appropriate satisfaction for their loss, they sued.

■ In *State Farm*, the United States Supreme Court identified the following constitutional restriction on evidence offered to prove punitive damages: "A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . . Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct . . . ." (*State Farm, supra,* 538 U.S. at pp. 422–423.) Evidence of such conduct is admissible only if the court "ensure[s] the conduct in question replicates the prior transgressions." (*Id.,* at p. 423.) "Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages," the court must exclude evidence regarding conduct "that had nothing to do" with the plaintiff's claim. (*Id.,* at pp. 423–424.)

■ This rule is mirrored in the Evidence Code. Subdivision (a) of section 1101 provides that evidence of a defendant's prior bad acts or bad character is generally inadmissible to prove a propensity or disposition to engage in conduct on a specified occasion.[10] While the evidence may be admissible to

---

[10] While section 1101 usually arises in criminal cases, the statute applies in civil cases as well. (*Brown v. Smith* (1997) 55 Cal.App.4th 767, 790, fn. 15 [64 Cal.Rptr.2d 301]; 1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 385, pp. 358–360.) "Section 1101 excludes evidence of character to prove conduct in a civil case for the following reasons. *First,*

prove some fact other than disposition, such as intent, method of operation, or absence of mistake or accident (§ 1101, subd. (b)), and evidence of a habit or custom may be admissible to prove the defendant acted in conformity with that habit or custom (§ 1105), the hallmark of admissibility on any of these grounds is similitude of the prior and present conduct. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757] [§ 1101]; *People v. Memro* (1985) 38 Cal.3d 658, 681 [214 Cal.Rptr. 832, 700 P.2d 446] [§ 1105].) In the same vein, while a plaintiff can demonstrate that a defendant's conduct "was more blameworthy and warrants a stronger penalty to deter continued or repeated conduct of the same nature" by placing that conduct "into the context of a business practice or policy" (*Johnson v. Ford Motor Co., supra*, 35 Cal.4th at p. 1206, fn. 6), similarity of the conduct is key to establishing such a practice or policy (*ibid.*).

We are mindful that *State Farm* dealt with dissimilar evidence offered to prove the *degree* of the defendant's reprehensibility in assessing the *amount* of punitive damages to be awarded. Here, the challenged evidence was offered to prove not only that Unocal's conduct was particularly reprehensible and therefore warranted substantial punitive damages, but was also offered to establish the predicate finding that Unocal was *liable* for punitive damages, i.e., that it was guilty of malice, fraud or oppression in its dealings with Plaintiffs. But we discern no legitimate reason why the due process concerns identified in *State Farm* do not apply with equal force when the challenged evidence is offered for both purposes. In issuing its ruling, the Supreme Court plainly stated that evidence of the defendant's dissimilar conduct "may not serve as the basis for punitive damages." (*State Farm, supra*, 538 U.S. at pp. 422–423.) No distinction is made between evidence offered to prove entitlement to punitive damages and evidence offered to prove the amount of damages to be awarded. Moreover, the elements of malice, fraud and oppression are subsumed in the factors the jury subsequently considers in assessing the degree of the defendant's reprehensibility.[11] We therefore conclude that *State Farm*'s proscription of dissimilar conduct to prove the amount of a punitive damages award also applies to

---

character evidence is of slight probative value and may be very prejudicial. *Second,* character evidence tends to distract the trier of fact from the main question of what actually happened on the particular occasion and permits the trier of fact to reward the good man and to punish the bad man because of their respective characters. *Third,* introduction of character evidence may result in confusion of issues and require extended collateral inquiry." (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1101, p. 438.)

[11] "Malice" is established by "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) "Oppression" requires a finding of "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) "Fraud" is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of

evidence offered to prove that the defendant is guilty of malice, fraud or oppression and is therefore subject to such an award. (See, e.g., *Kentucky Farm Bureau Mut. v. Rodgers* (Ky. 2005) 179 S.W.3d 815, 818 [recognizing same].)[12]

We also conclude that the Guadalupe and Avila Beach evidence was too dissimilar to the evidence presented regarding Unocal's conduct in causing and responding to the contamination of Plaintiffs' property and therefore should have been excluded. The Guadalupe evidence related to a spill of 8.5 million gallons of diluent on over 100 acres at a facility operated by a different division of Unocal. As a result of that spill, beaches, wetlands and the wildlife that rely on them were severely damaged or destroyed. Two former Unocal employees testified that they were essentially told by their supervisor to keep quiet about the spill, and that their efforts to respond to the disaster went unheeded. One of those employees also testified that he had witnessed efforts to conceal contamination that was plainly visible on the surface of the beach. When the state investigated, the supervisor of the facility was less than cooperative and denied responsibility for the incident. The facility's records also revealed that more than 100 spills at the facility had not been reported to the state.

Here, there was a leak from a pipeline that runs under the road named for the large oil reservoir facility where it originates. As a result of that leak, there was subsurface contamination along the perimeter of an adjacent commercial property that apparently poses no threat to the environment or the health and safety of anyone. The governing regulatory agency has apparently

---

thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).) In assessing the degree of reprehensibility, the jury considers, among other things, whether the defendant's tortious conduct "evinced an indifference to or a reckless disregard of the health or safety of others" and whether the harm the plaintiff suffered "was the result of intentional malice, trickery, or deceit, or mere accident." (*State Farm, supra*, 538 U.S. at p. 419; see BAJI No. 14.71.2.)

[12] Although *State Farm* involved a trial in which the plaintiff's entitlement to punitive damages and the amount of such damages to be awarded were decided in the same phase (*State Farm, supra*, 538 U.S. at p. 414), the evidence of the defendant's dissimilar conduct was apparently offered only to prove the degree of reprehensibility. Moreover, the opinion does not disclose any claim that the challenged evidence had any effect on the jury's finding of malice, fraud or oppression, or that the evidence was otherwise insufficient to support that finding.

*Johnson v. Ford Motor Co., supra*, 35 Cal.4th 1191, the first case in which our state Supreme Court applied *State Farm*, also involved a unified punitive damages trial. While the court's discussion focused solely on the evidence as it related to the assessment of reprehensibility in setting the amount of the punitive damages award, the court expressly declined to address the Court of Appeal's conclusion that the defendant's tortious conduct was consistent with a business practice or policy established by other evidence because the defendant "did not petition for review of the lower court's holding that sufficient evidence of fraud existed to justify an award of punitive damages . . . ." (*Id.*, at p. 1212, fn. 13.)

accepted Unocal's position that there is no need to excavate the contamination because it will simply dissipate through attenuation over time. Contrary to Plaintiffs' claim that Unocal "concealed" the contamination of their property or "had a secret plan" to leave it in place, the uncontroverted evidence demonstrates that for over a decade, Unocal has consistently represented that it would remediate the contamination to the extent required by the RWQCB. Indeed, the settlement negotiations between the parties plainly contemplated that Unocal would not excavate the contamination unless ordered to do so. As Plaintiffs acknowledge, total excavation would require the destruction of their buildings, a result they hoped to avoid through settlement. This is evidenced by a September 1999 letter in which Holdgrafer indicated that "[i]f we can not work out an agreement with Unocal, then we will hire an attorney firm from out of town to ask the courts to have Unocal clean our property of all contamination, rebuild buildings plus pay for all damages."

Plaintiffs also failed to establish any nexus between Unocal's intentional or negligent concealment of the numerous leaks at the Guadalupe facility and its purported failure to maintain adequate records of leaks that had occurred on the A and B lines. There was no evidence that Unocal failed to disclose any reports it actually had regarding A and B line leaks, or that it failed to report any such leaks to the government. On the contrary, Unocal's written policy was to report all leaks to the necessary regulatory agencies, and it is undisputed that the leak at issue in this case was reported.[13] Unocal did admit there may have been leaks at the Tank Farm facility that were not included in the leak reports, but there was no evidence from which it could be inferred that any of those leaks were ignored, or that Unocal ever violated its duty to report those leaks to the government.

---

[13] In denying Unocal's motion for JNOV and a new trial, the court relied in part on "Defendants' repeated claims that the records pertaining to the Tank Farm Road pipelines were 'missing' . . . ." It is unclear which missing records the court was referencing. Plaintiffs' citations to the record refer to missing records pertaining to annual surveys of the effectiveness of the cathodic protection system for each district and section of pipeline, or deal with the transfer, or "throughput," of oil from the Tank Farm facility through the A and B lines. Unocal employee Ken Smith explained that these records were incomplete because Unocal transferred all of its records when its operations were sold in 1997. Plaintiffs' own witness, former Unocal employee John Scoggins, testified that he had personally participated in *monthly* testing of the cathodic protection system from 1966 until 1986, that the pipelines were continuously monitored through a computerized system, and he did not recall any specific leaks during that period in the A and B lines. The annual surveys were characterized at trial as part of a "redundant" monitoring system. Unocal was also required by state regulations to submit annual surveys, and there is no indication that Unocal ever failed to comply with this requirement. Moreover, there was no evidence that Unocal claimed to be missing any reports of *leaks* that occurred on the A and B lines, although Unocal acknowledged that some leaks may not have been documented in the internal leak reports.

The Avila Beach evidence is also too dissimilar to satisfy due process. That evidence related to an incident in which the equivalent of approximately 800 barrels of crude oil spilled into the ocean at another facility, causing serious environmental damage, including killing birds and other wildlife. When the state responded, Unocal misrepresented that it could not accurately measure the spill's magnitude, then provided assessments regarding the magnitude of the spill and the rate of recovery that were significantly lower than the evidence indicated. None of these facts bears any similarity to the subterranean, nonhazardous contamination of Plaintiffs' property, or to Unocal's discovery and response to it.

*Kentucky Farm Bureau Mut. v. Rodgers, supra,* 179 S.W.3d 815, supports these conclusions. The Kentucky Supreme Court reversed a bad faith punitive damages award because evidence of the defendant insurer's dissimilar acts were admitted to prove malice, fraud or oppression, in violation of *State Farm* and the state's rules governing the admissibility of prior bad acts evidence.[14] In reaching its conclusion, the court reasoned in part that the erroneously admitted evidence related to an insurance claim handled by a different adjuster in which the defendant was the primary insurer, while the defendant was the secondary insurer in the plaintiff's case. (179 S.W.3d at p. 820.)

■ Here, there was no evidence indicating that the Unocal employees responsible for operating the Guadalupe facilities and responding to the spill had any connection to the Tank Farm facility, the A and B lines, or the company's response to the contamination of Plaintiffs' property. While Tank Farm facility employee Ron James was involved in the response to the spill at the Avila Beach facility, there is no evidence showing that he, or anyone else, has ever misrepresented the extent of the contamination of Plaintiffs' property, its cause, or the company's ability to quantify it. In any event, James's responses and reports regarding the spill at the Avila Beach facility are insufficient to demonstrate any deliberate attempt by *Unocal* to mislead the government or the public. (Civ. Code, § 3294, subd. (b) [providing that a corporation can be held liable for punitive damages only upon a showing by clear and convincing evidence that "an officer, director, or managing agent" "had advance knowledge of . . . or authorized or ratified the wrongful conduct for which the damages are awarded"].) Another Unocal employee notified the state authorities that the spill could be measured, and then provided the information to do so.

---

[14] Rule 404 of the Kentucky Rules of Evidence, entitled "Character evidence and evidence of other crimes," is essentially identical to section 1101 of our Evidence Code. Both are in accord with rule 404 of the Federal Rules of Evidence (28 U.S.C.).

■ Because the Guadalupe and Avila Beach evidence was not sufficiently similar to the evidence regarding the contamination of Plaintiffs' property and Unocal's response to it, it should not have been considered by the jury. Moreover, the potential for unfair prejudice brought on by the evidence was exacerbated by the court's failure to place any limitations on the jury's consideration of it. The United States Supreme Court recently recognized that even *similar* conduct cannot be utilized to punish the defendant for harm caused to others. (*Philip Morris, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 1063].) While "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible . . . a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties. [¶] . . . [T]he Due Process Clause requires States to provide assurance that juries are not asking the wrong question, *i.e.*, seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers." (*Id.*, at p. ___ [127 S.Ct. at p. 1064].) In cases such as this where there is a significant risk that the jury will be confused on this issue, the court must protect against that risk by giving a limiting instruction when requested by the defendant. (*Id.*, at p. ___ [127 S.Ct. at p. 1065].)

Here, the court denied Unocal's request to instruct the jury, in accordance with *State Farm*, that it should not consider conduct it deemed too dissimilar to that which harmed Plaintiffs in deciding whether to award punitive damages. While Unocal's proposed instruction does not squarely present the relevant principle enunciated in *Philip Morris*, it would have properly informed the jury that Unocal could not be punished for the impact its alleged misconduct had on others who were not parties to the litigation. Instead, the court imposed no instructional limitations on the Guadalupe and Avila Beach evidence, thereby providing the jury carte blanche to consider it, in violation of section 1101, subdivision (a), as proof that Unocal had a propensity or disposition to, among other things, engage in "cover ups," avoid responsibility for leaks, and lie to state authorities about the company's knowledge of their existence and magnitude.[15]

---

[15] To the extent the court believed that the evidence established a custom or policy of engaging in what amounts to criminal behavior, section 1105 plainly provides that evidence of a habit or custom is admissible to prove conduct in conformity with that habit or custom only when it is "otherwise admissible." As we have explained, the evidence failed to meet the admissibility requirements of section 1101. In any event, even if Unocal's conduct in causing and responding to the Guadalupe and Avila Beach spills was sufficiently similar to render it relevant to prove a custom or policy, the jury was given no guidance on how to make such a finding. Moreover, the evidence is insufficient as a matter of law to establish a companywide custom or policy of, as characterized by the court, "lying to third parties, including government regulators and the public, in order to avoid detection or responsibility" for leaks. (See *Webb v. Van Noort* (1966) 239 Cal.App.2d 472, 478 [48 Cal.Rptr. 823] [evidence offered to prove a

We also conclude that the error was prejudicial and resulted in a miscarriage of justice because it is reasonably probable that the jury would have reached a different result in its absence. (§ 353, subd. (b).) One need only look to the punitive damages award itself—$10,000,000.76—for an indication that the jury's passions were inflamed.[16] The Guadalupe and Avila Beach evidence was also the centerpiece of Plaintiffs' punitive damages case. The vast majority of the evidence presented in the punitive damages phase, and counsel's arguments to the jury, related to that evidence. Plaintiffs' counsel began his closing argument by recounting the evidence in great detail, and it dominated the rest of his presentation. At one point counsel asked: "You gonna buy this story that they're giving you that it's just a simple act of negligence, that all this evidence that we put on of the Avila spill and the misrepresentations and the Guadalupe spill and the misrepresentations and the northern division pipeline and the misrepresentations is just simple negligence? I got a word for it. Baloney." He also told the jury, "we're here in phase 3 . . . for justice to be done to others in the future," and asked, "[y]ou think Avila and Guadalupe and Tank Farm Road are the only places where there's oil underneath contaminating people's property?" Aside from wrongly inviting the jury to speculate on other unproved acts, these arguments also improperly invited the jury to punish Unocal for injuring nonparty victims. (*Philip Morris, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 1063].)

■ Given the inherently prejudicial nature of the evidence, and the limited scope and impact of the other evidence that was properly admitted to prove that Unocal's conduct against Plaintiffs was motivated by malice, fraud or oppression, the verdict awarding punitive damages is fatally flawed. Because the challenged evidence was admitted to prove both entitlement to punitive damages and the amount of such damages to be awarded, this is not a case in which we can simply reduce the punitive damages award to its constitutional limit. (See *Philip Morris, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 1065] [recognizing that the Court of Appeal's application of the proper constitutional standard announced in the decision in reviewing the punitive damages award on remand "may lead to the need for a new trial"].)

Unocal urges us to conclude that the properly admitted evidence was insufficient to support a finding that Unocal was guilty of malice, fraud or oppression in its dealings with Plaintiffs. In reviewing punitive damages awards, however, we cannot decide questions of fact that the plaintiff has a right to have decided by a jury. (Cf. *Simon v. San Paolo U.S. Holding Co., Inc.*

---

habit or custom in negligence cases under § 1105 is limited to conduct demonstrating a " 'person's regular practice of meeting a particular kind of situation with a specific type of conduct . . . thus indicating that the doing of the act is semi-automatic' [citation]; and that it must not be too remote in time or space from the time and place of the specified occurrence"].)

[16] The 76 cents refers to Union 76, one of the Unocal defendants' brands.

(2005) 35 Cal.4th 1159, 1187 [29 Cal.Rptr.3d 379, 113 P.3d 63].)[17] Accordingly, the matter must be remanded for a new trial on punitive damages.

## III.

### Interest

■ Former rule 875 (now rule 3.1802) of the California Rules of Court provides that judgments must include "the interest accrued since the entry of the verdict." Unocal contends the trial court erred in relying on this rule in awarding interest from the date of the verdict because the rule conflicts with Code of Civil Procedure section 685.020, subdivision (a), which provides that "interest commences to accrue on a money judgment on the date of entry of the judgment." This claim was rejected in *Ehret v. Congoleum Corp.* (2001) 87 Cal.App.4th 202 [104 Cal.Rptr.2d 370], and Unocal fails to persuade us that a different result should be reached in this case. Moreover, we agree with the trial court that former rule 875 is consistent with Civil Code section 3287, which provides for the payment of prejudgment interest from the date they are certain or capable of being made certain, e.g., the date the jury's verdict is entered. (See *Dixon Mobile Homes, Inc. v. Walters* (1975) 48 Cal.App.3d 964, 974–975 [122 Cal.Rptr. 202], disapproved on another point in *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814–815 & fn. 18 [148 Cal.Rptr. 22, 582 P.2d 109], cited in Legis. Com. com. & Cal. Law Revision Com. com., 17 West's Ann. Code Civ. Proc. (1987 ed.) foll. § 685.020, pp. 97–98.) Although Unocal argues that the verdict did not render Plaintiffs' damages certain as of that date, the cases it cites as support for that proposition merely recognize that prejudgment interest is not allowed under Civil Code section 3287 when the amount of damages awarded depended on the jury's resolution of conflicting evidence. (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958 [57 Cal.Rptr.2d 141]; *Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1175–1176 [221 Cal.Rptr. 675]; *Marine Terminals Corp. v. Paceco, Inc.* (1983) 145 Cal.App.3d 991, 995 [193 Cal.Rptr. 687].) Nothing in those cases undermines the conclusion that damages are rendered certain on the date that the jury's verdict awarding such damages is entered.

---

[17] In light of our conclusion, Unocal's remaining claims and Plaintiffs' cross-appeal are moot. For guidance on retrial, however, we note that it was improper for Plaintiffs to argue to the jury, and to urge to this court on appeal, that Unocal's assertion of the statute of limitations defense is relevant to prove the malice, fraud or oppression element of punitive damages. "[P]unitive damages in a tort action cannot be based on evidence of defendants' litigation conduct occurring subsequent to the underlying tort, and cannot be based on claims that defendants filed motions, appeals and other proceedings authorized by law." (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 895–896 [114 Cal.Rptr.2d 708].)

## DISPOSITION

The judgment is affirmed as to the award of compensatory damages and reversed as to the award of punitive damages. The matter is remanded for retrial solely on punitive damages. The parties shall bear their own costs on appeal.

Gilbert, P. J., and Yegan, J., concurred.

A petition for a rehearing was denied April 3, 2008, and the petition of plaintiffs and appellants for review by the Supreme Court was denied June 18, 2008, S162639. George, C. J., Werdegar, J., and Corrigan, J., did not participate therein.