Filed 3/22/17; pub. order 3/24/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WIND DANCER PRODUCTION GROUP et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> WALT DISNEY PICTURES et al., <br><br> Defendants and Respondents. | B262426 <br><br> (Los Angeles County <br> Super. Ct. No. BC501953) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William Highberger, Judge. Reversed.

Greines, Martin, Stein & Richland, Robin Meadow, Robert A. Olson, and Alana H. Rotter for Plaintiffs and Appellants.

O'Melveny & Myers, Daniel M. Petrocelli, Cassandra L. Seto, and Timothy B. Heafner, for Defendants and Respondents.

_____

Plaintiffs and appellants are writers and producers who entered into a profit participation agreement with defendant and respondent Walt Disney Pictures regarding their work on the television series, *Home Improvement*. The parties' agreement includes an "incontestability" clause, which requires a participant to object in specific detail to Disney's quarterly participation statements within 24 months after the date sent, and to initiate a legal action within six months after the expiration of that 24-month period. In July 2008, following an audit of Disney's books of account, the producers objected to the participation statements that were sent between June 2001 and March 2006. After Disney rejected the objections as untimely, the producers filed this action, alleging that Disney failed to properly account for and pay them the amounts owed under the parties' agreement. The trial court granted Disney's motion for summary adjudication on the ground that the producers' claims were time-barred by the contractual limitations period in the incontestability clause. For the reasons set forth below, we reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    The Parties' Agreement

*Home Improvement* was a popular television series that aired on network television between 1991 and 1999. The series continues to be sold in syndication and has generated substantial revenues to date.[1] Between 1989 and 1992, the parties entered

---

[1]    Plaintiffs and appellants Matt Williams, Carmen Finestra, and David McFadzean were *Home Improvement's* creators, writers, and producers, and their services on the show were furnished by plaintiffs and appellants Wind Dancer Production Group, Wind Dancer Productions, Inc., Finestra Productions,

2

into a series of written agreements (collectively, the "profit participation agreement") under which the producers agreed to transfer the rights to the series to Disney, and Disney agreed to pay the producers 75 percent of all net profits earned by the series. During the parties' contract negotiations, the producers were represented by highly regarded agents, attorneys, and production companies.

The profit participation agreement sets forth the terms for Disney's accounting of the net profits owed to the producers. As relevant here, the agreement states that Disney "shall render statements to Participant showing in summary form the appropriate calculations relating to the treatment of Gross Receipts, including all distribution fees, distribution expenses, other participations paid, interest and negative cost." The agreement further provides that Disney "shall keep books of account" regarding the production and distribution of the series, and that "[s]aid books, to the extent they have not become incontestable or have not been previously examined, may be examined at Participant's expense once in each 12 month period. . . . No such examination may continue beyond a period of 60 days after commencement thereof."

The agreement includes a clause entitled "Incontestability," which states in pertinent part: "Each statement shall be deemed conclusively correct and binding on Participant as to the transactions reflected therein for the first time on the expiration

---

Inc., and Tam O'Shanter Productions, Inc. Defendants and respondents are Walt Disney Pictures, Buena Vista Television, and The Walt Disney Company. For purposes of this appeal, we shall collectively refer to plaintiffs and appellants as the "producers" and to defendants and respondents as "Disney."

3

of a period . . . of 24 months after the date sent. . . . The inclusion of any item from a prior statement on a subsequent statement or of cumulative figures provided to Participant as a courtesy shall not render such prior-appearing item contestable or recommence the running of the applicable 24-month period with respect thereto. If Participant serves written notice on [Disney] within the applicable 24 month period objecting in specific detail to particular items and stating the nature of the objection, then insofar as such specified items are concerned such statements shall not be deemed conclusively correct and binding. If Participant's objections are not resolved amicably, Participant may maintain or institute an action with respect to an objection raised and not resolved amicably if commenced before the end of 6 months after the expiration of said 24 month period or prior to the expiration of the period of the applicable statute of limitations established by law as to such transactions or items, whichever first occurs. [Disney's] books of account and all supporting documentation need not be retained and may be destroyed after the expiration of said 24 month period unless Participant has duly objected prior thereto and instituted an action as herein provided."

The agreement also includes a section on "Standard Terms and Conditions" with provisions on waiver and modification. The "waiver" clause provides "[n]o waiver by either Lender, Artist, or [Disney] of any failure of the other party to fulfill any term hereof shall be deemed a waiver of any preceding or succeeding breach of nonfulfillment of the same or of any other term hereof." The "prior agreements" clause states that "[t]his Agreement constitutes the entire agreement between [Disney] and Lender and Artist and supersedes all prior written or oral agreements

4

pertaining hereto, and cannot be modified except by a writing signed by Lender and Artist and [Disney]. . . ."

## II.    The Audits of the Participation Statements

Since *Home Improvement's* debut in 1991, the producers have exercised their contractual right to audit Disney's books of account regarding the series on six occasions.  The current lawsuit concerns Audits 4 and 5.  According to Marcia Harris, the attorney who has represented the producers since 1997, Disney has not allowed the producers to conduct audits annually, nor has Disney permitted them to timely commence an audit upon receiving notice of such intent.  Instead, Disney has advised the producers that they must remain in a queue while other audits are pending.  Over the course of the parties' business dealings, Harris regularly communicated with Disney's in-house attorney, Christina Oswald, and there were occasions when they agreed, either orally or in writing, to toll the limitations period for certain participation statements during the pendency of an audit.  A summary of the audits requested by the producers and Disney's responses to those audits is set forth below.

### A.    Audit 1

In 1997, the producers filed a lawsuit against Disney based on their audit of the participation statements for the period from the inception of the series to March 31, 1996 (Audit 1).  Although many of the statements that were the subject of Audit 1 were more than 30 months old when the litigation commenced, Disney did not assert the limitations period in the incontestability clause as a defense to the producers' Audit 1 claims.  The parties settled the lawsuit in April 1999.

5

## B. Audits 2 and 3

After the lawsuit related to Audit 1 settled, the producers conducted an audit of the participation statements for the period from April 1, 1996 to December 31, 1998 (Audit 2), followed by an audit of the participation statements for the period from January 1, 1999 to December 31, 2000 (Audit 3). The producers did not object to the statements that were the subject of Audits 2 and 3 while those audits were pending. The auditors retained by the producers issued an Audit 2 report in December 1999, and an Audit 3 report in May 2002. In August 2002, the parties began negotiating a resolution of the claims raised by Audits 2 and 3. Although many of the statements at issue in those audits were more than 24 months old when the settlement negotiations commenced, Disney never asserted that the producers' Audit 2 or 3 claims were time-barred under the incontestability clause. Six years later, in May 2008, the parties settled the claims raised by Audits 2 and 3 without proceeding to litigation.

## C. Audits 4 and 5

On November 18, 2003, while the producers' Audit 2 and 3 claims were still pending, Harris orally notified Oswald that the producers intended to audit the participation statements for the period from January 1, 2001 to December 31, 2003 (Audit 4). Harris and Oswald also orally agreed to toll the limitations period for the statements that were the subject of Audit 4 until 90 days after the submission of the Audit 4 report to Disney. Harris memorialized the parties' oral agreement regarding the Audit 4 statements in a written tolling agreement, which was sent to Oswald, but was never signed. On January 12, 2004, Harris

6

provided Oswald with written notice of the producers' intent to commence Audit 4.  On February 4, 2004, Oswald sent Harris a letter stating that Disney agreed to extend the limitations period for the Audit 4 statements until October 15, 2004, provided that it received the Audit 4 report by that date.  On November 10, 2004, nearly 10 months after the producers gave Disney written notice of their intent to conduct Audit 4, Disney sent the auditors a confidentiality agreement, without which the auditors could not commence their field work for the audit.

Because Audit 4 was taking longer than anticipated, Harris and Oswald also orally agreed to toll the limitations period for participation statements that were issued after December 31, 2003 (the end date of the Audit 4 period) until the audit was completed.  On August 3, 2005, Harris memorialized the parties' oral agreement regarding these post-2003 statements in a written tolling agreement, which was sent to Oswald.  Disney never objected to Harris's request to toll the limitations period for the statements issued after December 31, 2003.

As of January 2006, the producers had three open audits pending with Disney.[2]  On February 16, 2006, two years after the producers notified Disney of their intent to conduct Audit 4, the auditors completed their field work for the audit and sent the

---

[2]    In a January 23, 2006 email responding to Harris's request that the parties move forward on their settlement negotiations regarding Audits 2 and 3, Oswald reminded Harris that Disney's "practice was not to permit additional audits prior to closure of the pending audit period," and that Disney had done so in this case as an accommodation to the producers.  Oswald also noted that the producers' "present stance would seem to prove the adage of no good deed going unpunished."

producers an Audit 4 report.  Of the 11 potential claims identified in that report, eight were listed as "undetermined" because the auditors were still awaiting information or documentation that they had requested from Disney.

The following day, on February 17, 2006, Harris provided Oswald with written notice that the producers intended to audit the participation statements for the period from January 1, 2004 to December 31, 2005 (Audit 5).  Harris was advised, however, that the producers could not begin the audit at that time, but rather would have to remain in a queue.  On September 12, 2007, one and a half years after the producers notified Disney of their intent to conduct Audit 5, the auditors completed their field work for the audit and sent the producers an Audit 5 report.  Ten of the 13 potential claims identified in that report were listed as "undetermined" because Disney had not provided all of the information or documentation requested by the auditors to assess those claims.

On July 29, 2008, Harris sent Disney the Audit 4 and 5 reports, which constituted the producers' written objections to the participation statements issued by Disney for the period from January 1, 2001 to December 31, 2005.  On August 13, 2008, Jacob Yellin, Disney's in-house attorney who had replaced Oswald, notified Harris that the time for objecting to the Audit 4 and 5 participation statements had already expired because the incontestability clause "effectively requires that any claim be made within 24 months after the first statement for the audit period is sent."  Yellin's response was the first time in the parties' relationship that Disney had asserted that the producers' audit claims were time-barred under the incontestability clause.

Harris and Yellin thereafter entered into a written tolling agreement that tolled the limitations period for the Audit 4 and 5 claims from October 3, 2008 through March 1, 2013, while the parties attempted to negotiate a resolution of those claims.[3] The agreement provided, however, that the parties were preserving whatever rights, claims, or defenses they had as of October 3, 2008, and that the agreement would not operate to revive any rights that may have been extinguished prior to that date.

### D.    Audit 6

On March 27, 2009, Harris provided Disney with written notice that the producers intended to audit the participation statements for the period from January 1, 2006 to the date that the audit commenced (Audit 6). In response, Jennifer Manenti, the head of Disney's Participations and Royalties Department, advised Harris that there was a wait to begin new audits, and that Disney would agree to toll the limitations period for the participation statements that were the subject of Audit 6 until that audit was allowed to commence.

On June 18, 2013, more than four years after the producers notified Disney of their intent to conduct Audit 6, Manenti informed Harris that the audit could begin for the participation statements issued through December 31, 2012. On November 7, 2013, while Audit 6 was underway, Harris provided Disney with

---

[3]    In a November 13, 2008 email to Yellin, Harris requested that the tolling agreement extend to participation statements rendered after December 31, 2005 (the end date of the Audit 5 period) while the parties engaged in settlement negotiations regarding Audits 4 and 5. Yellin refused, however, to toll the limitations period for any post-2005 statements.

9

written objections to "each and every line item and category set forth in the Audit 6 statements," to preserve the producers' potential Audit 6 claims under the incontestability clause. Disney rejected those objections, however, on the grounds that any claims based on statements sent before September 30, 2007 were time-barred, and that the objections as a whole were not sufficiently detailed to satisfy the specificity requirement in the incontestability clause. Disney contended that the time for objecting to any Audit 6 participation statement remained 24 months from the date the statement was sent.

## III.  The Current Litigation

The parties were unable to reach a settlement of the claims arising from Audits 4 and 5. On February 27, 2013, the producers filed this action against Disney, alleging causes of action related to Audits 4 and 5 for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, unfair competition, and accounting. The gravamen of the complaint was that Disney had licensed the *Home Improvement* series in the New York syndication market at below its fair market value, and had underreported the net profits owed to the producers by, among other acts, improperly charging certain distribution fees and costs and failing to include certain revenue in gross receipts. The complaint included allegations that the parties had entered into a series of tolling agreements, both oral and written, express and implied, under which the time for objecting to the participation statements and filing a legal action for claims arising from the statements was tolled until March 1, 2013. The complaint also included allegations that Disney was estopped from asserting that the producers' claims in this action

10

were time-barred based on Disney's course of conduct in refusing to allow the producers to meaningfully exercise their audit rights.

On February 4, 2014, Disney filed a motion for summary adjudication as to all causes of action except declaratory relief. Disney argued that these claims were time-barred under the incontestability clause because the producers did not object to the participation statements on which their claims were based within 24 months of the date the statements were sent. Disney also argued that the claims were not saved by any tolling agreement because the profit participation agreement expressly provided that it could not be modified except by a writing signed by the parties, and the only written tolling agreement signed by the parties took effect after the limitations period for the claims at issue in this action had expired.

On October 10, 2014, the producers filed an opposition to the motion for summary adjudication. Among other arguments, the producers contended that the incontestability clause did not bar their claims because the 24-month limitations period applied only to "transactions reflected" in the participation statements, and their claims were based on transactions that did not appear on the face of the summary statements issued by Disney. The producers also asserted that the limitations period was tolled by the parties' oral and written tolling agreements, and by the discovery rule based on Disney's secret breach of the profit participation agreement. In addition, the producers argued that Disney was estopped from relying on the incontestability clause because it had pursued a course of conduct, including authorizing and then delaying audits of allegedly incontestable statements, which had caused the producers to refrain from filing suit until after the expiration of the limitations period.

11

On January 6, 2015, the trial court granted Disney's motion on the ground that each challenged cause of action was time-barred under the incontestability clause. The court concluded that the contractual limitations period was enforceable and not subject to the discovery rule, and applied to any transaction that occurred in the period covered by the participation statement. The court further concluded that the producers had failed to show the existence of a valid, written tolling agreement that preserved their claims, and that any alleged oral tolling agreement was not enforceable because the parties' profit participation agreement expressly precluded oral modifications. The court also concluded that Disney was not estopped from relying on the incontestability clause because it was fulfilling its contractual obligations under the parties' agreement when it allowed the producers to audit participation statements that had already become incontestable by the time those audits commenced.

Following the trial court's order granting Disney's motion for summary adjudication, the producers voluntarily dismissed the remaining cause of action for declaratory relief because that claim had become part of a separate lawsuit that had been filed against Disney arising out of Audit 6. The trial court thereafter entered judgment in favor of Disney in this action, and the producers filed a timely appeal.

## DISCUSSION

### I. Standard of Review

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar*

*v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, at p. 850.) The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, at p. 850.)

Where summary judgment is granted, we review the trial court's ruling de novo. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) We consider all the evidence presented by the parties in connection with the motion (except that which was properly excluded) and all the uncontradicted inferences that the evidence reasonably supports. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We affirm summary judgment where it is shown that no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

## II.   Evidentiary Rulings

As a preliminary matter, we address the evidence that is properly before us on appeal. In the trial court, Disney objected to certain statements in the declaration submitted by Marcia Harris in support of the producers' opposition to the summary adjudication motion. Disney specifically objected to statements that the parties had entered into oral tolling agreements

13

consistent with "the custom and practice in the entertainment industry" and "the course of conduct between the parties." The trial court sustained Disney's objections to the custom-and-practice evidence as an improper offer of purported expert testimony, but did not sustain the objections to the course-of-conduct evidence. Accordingly, for purposes of this appeal, we consider Harris's statements regarding the alleged oral tolling agreements as evidence of the parties' course of conduct, but we do not consider those agreements as evidence of any custom or practice in the entertainment industry.

In ruling on the evidentiary objections, the trial court also sustained Disney's objection to an exhibit that was attached to Harris's declaration. That exhibit was an August 2005 email from Harris to Oswald concerning the parties' settlement negotiations over the Audit 2 and 3 claims. The court sustained Disney's objection to the email on the ground that prior settlement negotiations were an improper basis for proving liability under Evidence Code section 1152. However, that email also attached an unsigned tolling agreement for the Audit 5 participation statements, which were not part of the parties' settlement negotiations for the Audit 2 and 3 claims. On appeal, the producers contend that the trial court erred in sustaining the objection as to the Audit 5 tolling agreement. We agree that the tolling agreement was admissible because it was not offered to prove liability for any prior audit claims, and it is relevant to determining whether the limitations period for the Audit 5 claims at issue in this action may have been tolled. Even if the tolling agreement itself is not considered, however, Harris described the agreement in her declaration, and the trial court did not exclude those statements in ruling on the objections.

## III.   The Meaning of the Incontestability Clause

The trial court granted summary adjudication in favor of Disney on the ground that the challenged causes of action were time-barred by the 24-month contractual limitations period in the incontestability clause.  On appeal, the producers argue that the limitations period in the incontestability clause does not apply to any of their claims because the clause is limited to transactions that are apparent on the face of the participation statements. The producers further assert that Disney failed to satisfy its burden of showing that their claims are based on transactions that appear on the face of the participation statements because Disney did not offer any of those statements into evidence in support of its summary adjudication motion.

### A.   Relevant Law

"The rules governing the role of the court in interpreting a written instrument are well established.  The interpretation of a contract is a judicial function.  [Citation.]  In engaging in this function, the . . . court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed. [Citation.]  Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.  [Citations]. [¶] The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. [Citations.] Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]" (*Wolf v. Walt Disney Pictures & Television* (2008)

15

162 Cal.App.4th 1107, 1125-1126.) We ascertain "'the intent and scope of [an] agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made.'" (*Riverside Sheriffs Assn. v. County of Riverside* (2009) 173 Cal.App.4th 1410, 1424.) "We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation. [Citation.]" (*Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677, 688.) "If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. [Citation.]" (*Ibid*.)

## B. The Producers' Claims Are Within the Scope of the Incontestability Clause

The incontestability clause contained in the parties' profit participation agreement states that a participation statement becomes "conclusively correct and binding . . . as to the transactions reflected therein for the first time" unless the participant objects to the statement in "specific detail" within "24 months after the date sent." The producers interpret the phrase "as to the transactions reflected therein" to mean that the 24-month limitations period solely applies to transactions that are apparent on the face of the participation statement, and thus, does not include transactions that can only be discovered through the audit process. Disney, on the other hand, interprets the clause as applying to all transactions that occur within the accounting period covered by the participation statement, including transactions that are not apparent on the face of the statement but rather are reflected as part of the total revenues or costs in the relevant period. We conclude that, based on the

16

plain language of the agreement, Disney's interpretation of the incontestability clause is correct.

In setting forth the terms of Disney's accounting of net profits from the series, the agreement provides that Disney will issue quarterly participation statements, "showing in summary form the appropriate calculations relating to the treatment of Gross Receipts, including all distribution fees, distribution expenses, other participations paid, interest and negative cost." The agreement does not require that each license fee, distribution expense, or other transaction related to the series be itemized on the participation statements issued by Disney. To the contrary, the agreement expressly contemplates that the calculations for the various types of transactions encompassed by the statements will be presented "in summary form." As reflected in the exemplar participation statement provided by the producers, Disney lists the total gross receipts received for the series by the type of license fee (e.g., syndication, basic cable, home video), and the total deductions charged to the series by the type of distribution expense (e.g., advertising, taxes, trade dues). Each statement thus reflects Disney's calculations of the total revenues and total costs from the preceding quarter, and necessarily encompasses all of the underlying transactions on which those calculations are based.

The producers argue that the phrase "as to the transactions reflected therein" must be construed as a limitation on the types of transactions that are subject to the incontestability clause, or else the phrase has no meaning and is mere surplusage. (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 49 ["[w]e must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage"].) The plain

17

language of the clause, however, does not support that reading. The sentence containing the "transactions reflected therein" phrase states: "Each statement shall be deemed conclusively correct and binding on Participant as to the transactions reflected therein for the first time on the expiration of a period . . . of 24 months after the date sent. . . ." The next sentence states: "The inclusion of any item from a prior statement on a subsequent statement or of cumulative figures provided to Participant as a courtesy shall not render such prior-appearing item contestable or recommence the running of the applicable 24-month period with respect thereto."

When considered together, these two sentences make clear that, once a participation statement is sent, the running of the 24-month limitations period commences as to those transactions that are reflected in a statement "for the first time," but does not recommence as to those transactions that were reflected in "a prior statement," for example, by being included in a cumulative total column on the most recent statement. Accordingly, rather than acting as a limitation on the types of transactions that are subject to incontestability, the phrase "as to the transactions reflected therein" identifies how the 24-month limitations period applies to transactions that may be reflected in multiple participation statements. Specifically, the 24-month clock begins to run "the first time" a transaction is "reflected therein," and does not start anew whenever such transaction is reflected in a subsequent statement.

Moreover, if the producers' interpretation of the incontestability clause as applying solely to transactions apparent on the face of the statement were correct, it would nullify the contractual limitations period in all but the narrowest

18

of circumstances. Specifically, the 24-month period for objecting to participation statements would rarely, if ever, be triggered because the statements rendered by Disney do not delineate any particular transactions, but rather provide a summary of the total revenues and costs generated in a given quarter, as expressly permitted by the parties' agreement. While the producers offer a few examples of hypothetical errors that might appear on the face of a statement, their interpretation of the contract, if accepted, also would mean a single statement could be subject to conflicting time requirements. Under the producers' reading, there would be a 24-month deadline for objecting to those very rare transactions that appear on the face of the statement, but no deadline for objecting to all other transactions covered by that statement. The time for filing suit also could be subject to two different limitations periods—one contractual and one statutory—depending upon the transactions underlying the claim. When the agreement is considered as a whole and in context, however, there is no indication the parties intended for the incontestability clause to be construed so narrowly.

The producers do not dispute that, under their reading of the agreement, the incontestability clause would rarely apply due to the summary nature of the participation statements issued by Disney. They assert, however, that Disney can trigger the 24-month limitations period whenever it wants simply by itemizing the transactions on the participation statements, and they argue that if Disney instead chooses to issue summary statements, it foregoes the benefit of the incontestability clause. Yet there is nothing in the plain language of the agreement to suggest that the parties intended for the provision expressly authorizing the issuance of participation statements in summary form to nullify

19

the incontestability clause whenever a summary statement is issued. Such an interpretation of the parties' agreement would render the incontestability clause ineffective. Rather, when these two provisions are considered together, the only reasonable interpretation is that a participation statement must reflect all transactions that occur during the relevant accounting period in "summary form," and that the statement becomes "conclusively correct and binding" as to those transactions unless the participant objects within 24 months after the date sent.

The producers contend that this interpretation of the contract is unreasonable because they are required to object to the participation statements "in specific detail" within 24 months after the date sent, but they have no way of knowing if Disney is properly accounting for all revenues and costs based on the summary statements that are issued. However, the agreement grants the producers the right to audit Disney's books of account on an annual basis so that they can independently assess whether Disney's calculations of the net profits owed are correct. The producers argue that Disney has acted to deprive them of the benefit of their audit rights by causing long delays in the audit process, such as forcing them to wait in an audit queue and failing to provide necessary information and documents to their auditors. As discussed below, Disney's alleged practice of delaying the audits to the point that the producers are unable to timely object is relevant to determining whether Disney may be estopped from asserting the incontestability clause as a defense in this case. Disney's alleged failure to raise the incontestability clause in prior audits also is relevant to the estoppel analysis. While course-of-performance evidence can be relevant to ascertaining what the parties intended the contract to mean at

20

the time of execution, such evidence may not be used to vary or contradict the unambiguous terms of a written agreement. (*In re Tobacco Cases I, supra*, 186 Cal.App.4th at p. 52.) Even if relevant on the issue of intent, the evidence concerning Disney's course of conduct does not reflect that the parties understood and intended the incontestability clause to only apply to transactions that are apparent on the face of the statements. Rather, such evidence shows that, at various times in the parties' relationship, Disney simply did not enforce the incontestability clause with respect to any transaction whatsoever.

Because the plain language of the agreement reflects that the incontestability clause applies to all transactions that occur in the accounting period covered by the participation statements, Disney satisfied its burden of proof on summary adjudication by presenting evidence showing the dates on which the participation statements were sent, and the dates on which the producers first notified Disney of their objections to those statements. Disney was not required to put all of the statements into evidence, or to trace each transaction underlying the producers' claims to a particular statement. It is undisputed that the producers' claims in this action are based on transactions that occurred between January 1, 2001 and December 31, 2005 (the Audit 4 and 5 periods), and that the participation statements covering those accounting periods were sent between June 29, 2001 and March 31, 2006. It is also undisputed that the producers first objected to those statements on July 29, 2008, when they provided Disney with the Audit 4 and 5 reports, which was more than 24 months after the date on which the last statement was sent. Based on this undisputed evidence, Disney met its burden of showing that the 24-month limitations period in the parties' agreement expired

21

prior to the producers objecting to the participation statements. We therefore consider whether there are triable issues of fact as to the timeliness of the producers' claims based on the discovery rule or the doctrines of waiver and estoppel.

## IV.   Applicability of the Discovery Rule

The producers contend that there are triable issues of fact as to whether their claims are timely based on the discovery rule. They specifically argue that, under the discovery rule, their claims did not accrue on the date the participation statements were sent, but rather on the date they discovered, or reasonably should have discovered, that Disney was breaching the profit participation agreement.  They further assert that they could not reasonably have discovered Disney's breaches until they were able to conduct Audits 4 and 5 and to receive final audit reports.

### A.   Relevant Law

"Generally, in both tort and contract actions, the statute of limitations 'begins to run upon the occurrence of the last element essential to the cause of action.'  [Citation.]  'The cause of action ordinarily accrues when, under the substantive law, the wrongful act is done and the obligation or liability arises. . . .' [Citation.]" (*Brisbane Lodging, L.P. v. Webcor Builders, Inc.* (2013) 216 Cal.App.4th 1249, 1257 (*Brisbane*).)  "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.)  As this court has recognized, the discovery rule "may be applied to breaches [of contract] which can be, and are, committed in secret and,

22

moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 832; see *Gryczman v. 4550 Pico Partners, Ltd.* (2003) 107 Cal.App.4th 1, 5 [discovery rule applicable to breach of contract action where defendant "not only breached the contract 'within the privacy of its own offices' but the act which constituted the breach . . . was the very act which prevented plaintiff from discovering the breach"].)  Under the discovery rule, the plaintiff must show that, "despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." (*Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, at p. 809.)

It is also well-established that parties to a contract "may agree to a provision shortening the statute of limitations, 'qualified, however, by the requirement that the period fixed is not in itself unreasonable or is not so unreasonable as to show imposition or undue advantage.  [Citations.]'  [Citations.]" (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 183.)  "'Reasonable' in this context means the shortened period nevertheless provides sufficient time to effectively pursue a judicial remedy.'" (*Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1430 (*Moreno*).)  "'A contractual period of limitation is reasonable if the plaintiff has a sufficient opportunity to investigate and file an action, the time is not so short as to work a practical abrogation of the right of action, and the action is not barred before the loss or damage can be ascertained. . . .' [Citation.]" (*Ellis v. U.S. Security Associates* (2014) 224 Cal.App.4th 1213, 1223.)  So long as the time allowed for filing an action is not inherently unreasonable, California courts afford

23

"contracting parties considerable freedom to modify the length of a statute of limitations." (*Moreno*, *supra*, at p. 1430.)

In *Moreno*, *supra*, 106 Cal.App.4th 1415, this court considered the extent to which contracting parties may effectively waive the discovery rule by agreeing to a shortened limitations period that begins to run upon a specified event. The plaintiffs in *Moreno* were two home buyers who filed suit against a home inspector for breach of contract and negligence 14 months after the inspector allegedly failed to competently inspect the buyers' prospective home. The home inspection contract signed by the parties provided that any lawsuit had to be filed within one year of the date of the inspection. The trial court sustained the inspector's demurrer without leave to amend on the ground that the one-year limitations period in the contract barred the buyers' causes of action. (*Id*. at pp. 1419-1420.) This court reversed, holding that a limitations period of one year from the date of the inspection was unreasonable as a matter of law, and that the buyers' causes of action did not accrue under the limitations period provided in the home inspection contract until they discovered, or reasonably should have discovered, the inspector's breach. (*Id*. at p. 1419.) We explained that, while contracting parties have considerable freedom to shorten the statute of limitations, "situations involving home inspectors share many characteristics with those involving other professionals in which delayed accrual has been recognized as appropriate and necessary. . . . As with other forms of professional malpractice, specialized skill is required to analyze a residence's structural and component parts. Because of the hidden nature of these systems and components a potential homeowner may not see or recognize a home inspector's negligence, and thus may not

24

understand he has been damaged until long after the inspection date. This fact, coupled with the trust the potential homeowners must necessarily place in the professional home inspector, compel the conclusion causes of action for breach of a home inspector's duty of care should accrue in all cases, not on the date of the inspection, but when the homeowner discovers, or with the exercise of reasonable diligence should have discovered, the inspector's breach."[4] (*Id*. at pp. 1428-1429, fn. omitted.)

More recently, in *Brisbane*, *supra*, 216 Cal.App.4th 1249, our colleagues in the First Appellate District considered whether sophisticated contracting parties may abrogate the discovery rule by agreeing to an accrual date for claims arising from the contract. The parties in *Brisbane* were a commercial property owner and a builder who entered into a contract for the design and construction of a hotel. The contract included a provision that all causes of action would accrue on the date of substantial completion of the project. More than four years after the project was completed, the owner sued the builder for latent construction defects, and the trial court granted summary judgment for the builder on the ground that the action was time-barred. (*Id*. at pp. 1254-1256.) The court of appeal affirmed, holding that

---

[4] In a dissent, Justice Perluss disagreed with the majority's conclusion that the limitations period in the parties' contract was unreasonable as a matter of law because it impliedly required the buyers to waive the benefit of the discovery rule. Justice Perluss noted that "California courts have uniformly enforced provisions shortening the four-year statutory limitations period for breach of a written contract [citation] to one year," and that "[n]o statute prohibits the parties to a home inspection contract from agreeing to a shortened limitations period." (*Moreno*, *supra*, 106 Cal.App.4th at p. 1440.)

"public policy principles applicable to the freedom to contract afford sophisticated contracting parties the right to abrogate the delayed discovery rule by agreement." (*Id*. at pp. 1253-1254.) The court reasoned that "[b]y tying the running of the applicable statute of limitations to a date certain, the parties . . . negotiated to avoid the uncertainty surrounding the discovery rule for the security of knowing the date beyond which they would no longer be exposed to potential liability." (*Id*. at pp. 1260-1261.) The court concluded that "sophisticated parties should be allowed to strike their own bargains and knowingly and voluntarily contract in a manner in which certain risks are eliminated and, concomitantly, rights are relinquished." (*Id*. at p. 1261.)

In enforcing the parties' accrual provision, the *Brisbane* court distinguished the decision in *Moreno*. The court noted that the home buyers in *Moreno* were "persons unsophisticated in construction matters," and that the home inspector "was a professional in possession of special skills and knowledge upon whom the homeowners relied completely for counsel and advice." (*Brisbane*, *supra*, 216 Cal.App.4th at p. 1266.) In contrast, the hotel owner and builder in *Brisbane* "occupied positions of equal bargaining strength and both parties had the commercial and technical expertise to appreciate fully the ramifications of agreeing to a defined limitations period," in addition to "the participation and advice of legal counsel during contract negotiations." (*Id*. at p. 1267.) The *Brisbane* court made clear that "'"[w]hether a contract is illegal or contrary to public policy is a question of law to be determined *from the circumstances of each particular case*." [Citation.]' [Citation.]" (*Id*. at p. 1266.)

## B. The Producers Waived the Discovery Rule by Agreeing to the Incontestability Clause

The parties dispute whether the discovery rule applies to the producers' causes of action against Disney. The producers contend that the discovery rule applies because their claims are based on Disney's secret breaches of the profit participation agreement, which the producers could not reasonably have discovered until they conducted an audit of the participation statements. Disney counters that the producers expressly waived the discovery rule by agreeing to the incontestability clause, and even if the discovery rule was not waived, it does not apply here because the producers could have discovered any alleged breach by exercising their audit rights. We conclude that the producers waived the benefit of the discovery rule by contractually agreeing to a shortened limitations period with a specified date of accrual.

The incontestability clause in the parties' agreement states that a participant must object to a participation statement within "24 months after the date sent," and must file a legal action within "6 months after the expiration of said 24 month period." The clause accordingly provides that a claim arising from a participation statement accrues on the date the statement is sent, irrespective of whether the participant knows, or has reason to know, the facts supporting the claim. Like the accrual provision in *Brisbane*, the incontestability clause effectively abrogates the discovery rule by setting forth a "date certain" on which a cause of action accrues. (*Brisbane*, *supra*, 216 Cal.App.4th at p. 1260.) The clause also shortens the applicable statute of limitations to 24 months for serving objections to a contested participation statement, plus an additional six months for filing suit. On its face, the 24-months limitations period

27

agreed to by the parties is not unreasonable.  Indeed, California courts routinely have enforced contractual provisions shortening the four-year statute of limitations for breach of a written contract to periods of one year or less.  (See *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1548 [citing cases upholding provisions shortening the four-year statute of limitations for breach of a written contract to one year, six months, or three months].)  This is consistent with the "long-standing established public policy in California which respects and promotes the freedom of private parties to contract." (*Brisbane, supra,* at p. 1262.)

In assessing the enforceability of a contractual limitations period, we also consider the respective bargaining positions of the parties.  Here, it is undisputed that the producers are well-known and successful individuals in the entertainment industry, who had worked on other popular television shows prior to developing the *Home Improvement* series.  During the parties' negotiations over the profit participation agreement, the producers were represented by highly regarded attorneys, agents, and production companies.  The provisions in the agreement regarding Disney's accounting of the series' profits, including the incontestability clause, contain numerous interlineations reflecting the extent of the parties' contract negotiations.  The producers are therefore more akin to the experienced commercial property owner in *Brisbane* who was represented by legal counsel in negotiating a large-scale construction project, than the home buyers in *Moreno* who relied on the home inspector for specialized counsel and advice about their prospective purchase.  Given the equal bargaining strength of the parties, the producers were not

28

precluded from waiving the discovery rule by expressly agreeing to a shortened limitations period with a fixed accrual date.

The producers nonetheless assert that a 24-month limitations period without the benefit of the discovery rule is per se unreasonable and unenforceable because it does not afford them a sufficient opportunity to investigate and file an action. The producers note that they can only conduct an audit once every 12 months, and that Disney's delays cause each audit to take several years. As previously noted, Disney's alleged conduct in delaying the audit process is relevant to whether it may be estopped from asserting the incontestability clause as a defense in this case. However, such evidence does not demonstrate that the 24-month limitations period is "*in itself*, unreasonable" so as to render the provision unenforceable as a matter of law. (*William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1307; see also *Charnay v. Cobert*, *supra*, 145 Cal.App.4th at p. 183 [provision shortening statute of limitations is unenforceable if it is "inherently unreasonable"].)

On its face, the profit participation agreement provides the producers with sufficient time to audit the quarterly participation statements and to serve objections to those statements within a period of 24 months. The agreement allows the producers to conduct an audit once every year, and provides that the audit must be completed within 60 days after it is commenced. Like any other contract, the parties' agreement also includes an implied covenant of good faith and fair dealing that imposes on each party "not only a duty to refrain from acting in a manner that frustrates performance of the contract "'but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.'"" (*Brehm v. 21st Century Ins. Co.* (2008)

29

166 Cal.App.4th 1225, 1242.) Disney thus has a duty under the contract to ensure the producers are able to exercise their audit rights in a manner that gives them a reasonable opportunity to conduct an audit within 60 days and to serve objections to the participation statements within 24 months. An alleged breach of such duty by Disney could give rise to legal liability or estop it from asserting a contractual limitations defense in a particular case. It does not, however, establish that a 24-month limitations period which begins to run on the date a participation statement is sent is unenforceable as a matter of law.

## V. Applicability of the Waiver and Estoppel Doctrines to the Incontestability Clause

The producers argue that there are also triable issues of fact as to whether Disney is precluded from asserting the incontestability clause as a defense in this case under the doctrines of waiver and estoppel. In particular, the producers contend that Disney orally agreed to toll the limitations period for their Audit 4 and 5 claims, and engaged in other conduct which induced them to refrain from serving objections and filing suit within the deadlines set forth in the agreement. Disney counters that the doctrines of waiver and estoppel do not apply because the agreement precludes any oral modifications, and the producers could not reasonably have relied on Disney's alleged conduct in failing to comply with the incontestability clause.

### A. Relevant Law

The modification of a written contract is governed by Civil Code section 1698, which states in pertinent part: "(a) A contract in writing may be modified by a contract in writing. [¶] (b) A

30

contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties. [¶] (c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration. . . . [¶] (d) Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, . . . [or] waiver of a provision of a written contract. . . .”

Accordingly, notwithstanding a provision in a written agreement that precludes oral modification, the parties may, by their words or conduct, waive contractual rights.  (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1339 [“[l]ike any other contractual terms, timeliness provisions are subject to waiver by the party for whose benefit they are made”]; *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 [“‘parties may, by their conduct, waive [a no oral modification] provision’ where evidence shows that was their intent”].)  “‘[T]he pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right.’  [Citation.]” (*Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 678.)  ‘“The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right.  [Citation.]’ [Citation.]  Thus, ‘“California courts will find waiver when a party intentionally relinquishes a right or when that party’s acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.”  [Citation.]’  [Citation.]” (*Ibid.*)  Waiver is ordinarily a question of fact unless “there are no disputed facts and only one reasonable inference may be drawn.” (*DuBeck v. California Physicians’ Service* (2015) 234 Cal.App.4th 1254, 1265.)

31

In addition to waiving contractual rights, the parties may, by their words or conduct, be estopped from enforcing a written contract provision. Under the doctrine of estoppel, "[a] defendant may be equitably estopped from asserting a statutory or contractual limitations period as a defense if the defendant's act or omission caused the plaintiff to refrain from filing a timely suit and the plaintiff's reliance on the defendant's conduct was reasonable." (*Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 186.) "'It is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff. [Citations.] It is sufficient that the defendant's conduct in fact induced the plaintiff to refrain from instituting legal proceedings. [Citation.]'" (*Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 925.) As our Supreme Court has explained, "'"[a]n estoppel may arise although there was no designed fraud on the part of the person sought to be estopped. [Citation.] To create an equitable estoppel, 'it is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss. . . .'"' [Citations.]" (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384.) "'[W]hether an estoppel exists – whether the acts, representations or conduct lulled a party into a sense of security preventing him from instituting proceedings before the running of the statute, and whether the party relied thereon to his prejudice – is a question of fact and not of law.'" (*Holdgrafer v. Unocal Corp.*, *supra*, at pp. 925-926.)

32

### B. There Are Triable Issues of Fact as to Whether Disney Waived or Is Estopped from Asserting a Contractual Limitations Defense

In granting summary adjudication in favor of Disney, the trial court concluded that the producers' evidence of oral tolling agreements did not demonstrate the existence of a triable issue because the profit participation agreement states that it can only be modified by a writing signed by the parties. The trial court also concluded that the evidence of Disney's course of conduct in the audits did not give rise to estoppel as a matter of law because Disney was merely fulfilling its obligations under the agreement when it allowed the producers to audit participation statements that had already become incontestable by the time the audits commenced. We conclude, however, that summary adjudication was improper because there are triable issues of material fact as to whether Disney, by its words or conduct, either waived or is estopped from asserting the contractual limitations period in the incontestability clause as a defense to the producers' claims.

#### 1. Waiver

In their complaint, the producers alleged that the parties had "entered into a series of tolling agreements, both oral and written, express and implied," under which the time for objecting to the Audit 4 and 5 participation statements and filing suit for claims arising from such statements was tolled through March 1, 2013. In its motion for summary adjudication, Disney did not present any evidence to negate the existence of the oral tolling agreements alleged in the producers' complaint. Instead, Disney argued that the profit participation agreement expressly stated that it could not be modified except by a writing signed by the parties, and there was no signed, written tolling agreement that

33

preserved any of the producers' claims.  In opposing Disney's motion, the producers offered evidence of oral and written tolling agreements that, if enforceable, tolled the limitations period for the producers' claims through the filing of this lawsuit.

Specifically, Marcia Harris, who represented the producers in their business dealings with Disney, stated in a declaration that she made oral agreements with Disney to toll the limitations period for the participation statements covered by Audits 4 and 5.  She then sent unsigned, written agreements to Disney, which memorialized the parties' oral tolling agreements.  The tolling agreements provided that the limitations period for the Audit 4 statements would be tolled from November 18, 2003 until 90 days after the producers submitted the Audit 4 report, and that the limitations period for the Audit 5 statements would be tolled until either party cancelled the agreement in writing.  At the time the parties entered into these oral tolling agreements, the 24-month limitations period had expired for two of the 12 Audit 4 statements, but had not expired for any of the Audit 5 statements.  It is undisputed that the producers submitted the Audit 4 and 5 reports to Disney on July 29, 2008, and the parties entered into a written tolling agreement that took effect fewer than 90 days later on October 3, 2008.  It is also undisputed that the written tolling agreement was still in effect when the producers filed this action on February 27, 2013.  The producers thus presented evidence of continuous tolling from November 18, 2003 through the filing of this action, which would encompass all of the Audit 5 statements and 10 of the 12 Audit 4 statements.

In granting Disney's motion for summary adjudication, the trial court concluded that there could be no oral tolling because the profit participation agreement includes a clause which states

34

that any modifications must be in a writing signed by the parties. The law is clear, however, that notwithstanding a provision in a written contract that expressly precludes oral modification, the parties may, by their words or conduct, waive the enforcement of a contract provision if the evidence shows that was their intent. Accordingly, the no-oral-modification clause in the profit participation agreement did not preclude Disney from waiving other provisions in the agreement that were made for its benefit, including the time limitations in the incontestability clause. It also did not preclude Disney from orally agreeing to toll the limitations period for the Audit 4 and 5 statements that are the subject of this action while those audits were pending.

Disney argues that a "standing agreement" to toll the 24-month limitations period for "all statements" until the audits are completed "would not amount to a one-time waiver," but would instead "fundamentally modify" the incontestability clause. However, Harris did not assert in her declaration that the parties had a standing tolling agreement for all participation statements issued by Disney. Rather, she stated that there were times when the parties orally agreed to toll the limitations period for the statements that were the subject of a certain audit while that audit was pending. The oral tolling agreements for the Audits 4 and 5 statements therefore did not serve to modify the 24-month limitations period for all past or future participation statements issued by Disney. Rather, these tolling agreements temporarily suspended the running of the limitations period only for the statements covered by Audits 4 and 5 and only for a specified period of time while the audits were pending.[5] Therefore, based

---

[5] Disney also asserts that the producers' evidence of tolling shows that they understood a written agreement was required

on the evidence offered by the producers, there are triable issues of material fact as to whether Disney waived the contractual limitations period in this particular instance by entering into oral tolling agreements that preserved the producers' claims.

### 2.    Estoppel

In addition to the oral tolling agreements, the producers presented evidence that Disney engaged in other conduct over the course of the parties' relationship which caused the producers to refrain from objecting to the participation statements within the 24-month limitations period. Specifically, the producers showed that, at various times in the parties' dealings, Disney could have asserted that the producers' audit claims were time-barred under the incontestability clause, but did not do so. Disney did not raise the incontestability clause as a defense when the producers filed suit in 1997 based, in part, on Audit 1 statements that dated back to 1991, or when the parties negotiated from 2002 to 2008 over Audit 2 and 3 statements that dated back to 1996. Disney also did not invoke the incontestability clause in January 2004, when the producers sent written notice of their intent to conduct Audit 4, even though three of the Audit 4 statements were more than 24 months old at the time of the notice. Disney again failed

_____

because Harris sent Disney proposed written tolling agreements for both Audits 4 and 5, which were never signed by Disney. This argument, however, goes to the weight of the evidence, and does not demonstrate the absence of an enforceable oral tolling agreement. Whether the unsigned writings were a memorialization of the parties' oral tolling agreements, as asserted by Harris in her declaration, or were proposed drafts of written tolling agreements that were never finalized, as argued by Disney, is a question of fact for the jury.

to invoke the incontestability clause in November 2004, when it sent the auditors a confidentiality agreement to sign to begin the Audit 4 field work. By that point, half of the Audit 4 statements were more than 24 months old, but Disney nevertheless allowed the audit of those statements to proceed. It was not until August 2008, more than four years after the producers requested Audit 4 and more than two years after they requested Audit 5, that Disney asserted for the first time that the producers' audit claims were time-barred under the incontestability clause.

The producers also presented evidence that Disney had a practice of delaying audits such that they were unable to timely object to the participation statements within the 24-month limitations period. In particular, the producers submitted evidence showing that Disney did not allow the audits, including Audits 4 and 5, to commence within a reasonable time upon receiving the producers' requests. Instead, Disney had a practice of permitting only one audit at a time. Disney also had a practice of making the producers wait for long periods of time in an audit queue before taking the steps required on its part to allow the auditors to begin their field work. For example, the evidence showed that Disney did not send the auditors the confidentiality agreement required for Audit 4 until 10 months after the producers formally requested that audit. The producers also presented evidence that, once the audits were allowed to begin, they took years to complete because Disney failed to timely respond to the auditors' requests for information and documents that were needed to assess potential claims. As a result of these delays, the producers did not receive a report from the auditors until 25 months after they requested Audit 4, and 19 months after they requested Audit 5. By that point, more than 24

37

months had passed since most of the Audit 4 and 5 statements had been sent, and objecting to those statements at that time would have been untimely under the incontestability clause.

Disney contends that it was merely fulfilling its contractual obligations under the agreement by allowing the producers to conduct Audits 4 and 5, even though the limitations period had already expired for some of the covered statements by the time those audits commenced. The audit provision in the parties' agreement clearly states, however, that the producers only have a right to audit the participation statements "to the extent they have not become incontestable." The producers' right to conduct audits therefore would not extend to statements that were time-barred under the incontestability clause.

Disney also claims that its prior conduct in failing to enforce the incontestability clause is irrelevant to the current action because the parties' agreement includes an anti-waiver provision which states that a failure to enforce a contract term in one instance shall not be deemed a waiver of that term in another instance. However, the relevant inquiry in an estoppel analysis is whether the defendant's acts or omissions caused the plaintiff to refrain from timely filing suit and whether the plaintiff's reliance on the defendant's conduct was reasonable. The anti-waiver provision does not establish that, as a matter of law, it was unreasonable for the producers to rely on Disney's course of conduct when they decided to proceed with audits that had been approved by Disney, rather than serve prophylactic objections to the participation statements or pursue other legal remedies.

Disney further argues that its alleged conduct in causing audit delays cannot give rise to equitable estoppel as a matter of law. In support of this argument, Disney cites to federal district

court cases which applied New York law to hold that a defendant was not estopped from asserting a contractual limitations defense even where it purposefully delayed in providing information or documents to the plaintiff during the audit process.[6] We are not bound by these district court cases, however, nor do we find their reasoning persuasive in this case. The evidence submitted by the producers showed that, in addition to failing to timely respond to requests for information and documents, Disney had a practice of allowing only one audit to proceed at a time, and of requiring the producers to wait in an audit queue for long periods of time before permitting their audits to begin. Yet the incontestability clause requires the producers to object "in specific detail" to the participation statements within 24 months after the date sent. In the absence of a timely and thorough audit, the producers could not submit detailed objections to the summary statements issued by Disney, and thus, could not satisfy the time limitations in the incontestability clause.[7] The cumulative effect of Disney's

---

[6] See *Allman v. UMG Recordings* (S.D.N.Y. 2008) 530 F.Supp.2d 602; *RSI Corp. v. International Business Machines Corp.* (N.D. Cal. Mar. 9, 2009) 2009 U.S. Dist. LEXIS 18212; *Toto, Inc. v. Sony Music Entertainment* (S.D.N.Y. Dec. 11, 2012) 2012 U.S. Dist. LEXIS 175389.)

[7] Indeed, after Disney asserted for the first time that the Audit 4 and 5 claims were time-barred under the incontestability clause, the producers submitted generalized objections to the Audit 6 statements to preserve their rights while that audit was pending. Disney rejected the objections as not sufficiently detailed under the incontestability clause, and claimed that the 24-month limitations period for objecting to the Audit 6 statements was continuing to run.

delays was that the producers were precluded from complying with their obligations under the parties' agreement.

Based on the totality of evidence presented about Disney's alleged conduct, including the oral tolling agreements, the prior failure to enforce the incontestability clause, and the chronic delays in the audit process, we conclude that there are triable issues of material fact as to whether Disney may be estopped from asserting the contractual limitations period as a defense to the producers' claims.  The trial court accordingly erred in granting summary adjudication in favor of Disney.

## DISPOSITION

The judgment is reversed.  The producers shall recover their costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


SMALL, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed: 3/24/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WIND DANCER PRODUCTION GROUP et al., | B262426 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC501953) |
| v. | **ORDER CERTIFIYING OPINION FOR PUBLICATION** |
| WALT DISNEY PICTURES et al., | |
| Defendants and Respondents. | |

THE COURT:

The opinion in this case filed March 22, 2017 was not certified for publication. On the court's own motion the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

IT IS HEREBY ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion be published in the Official Reports.

_____

PERLUSS, P. J.,      ZELON, J.,      SMALL, J. (Assigned)

41